# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

─────────────────────────────────────────────────────────

Kristin Naca,                      Case File 16-cv-3263 PJS/BRT

Plaintiff,

v.

Macalester College,

     Defendant.

────────────────────────────────────────────────────────

## AMENDED COMPLAINT – JURY DEMANDED

────────────────────────────────────────────────────────

## INTRODUCTION

1.  Professor Kristin Naca (Plaintiff, Naca, Iyawó) sues Macalester College (Macalester), a recipient of federal monies, for the discriminatory and retaliatory termination of her employment as a tenure-track Poetry professor on 29 September 2016. During her six years of employment as a Faculty Diversity Fellow, then tenure-track Assistant Professor of Poetry, Defendant threatened Plaintiff's employment due to her systemic Valley Fever, her sincere practice of the religion of Santería, sex, sexual orientation, and her Filipina and Puerto Rican ancestry and national origin.

2. Systemic Valley Fever is a chronic, disabling, respiratory disease that substantially impairs breathing, concentrating, and locomotion. Plaintiff suffered fatigue, language dysfunction, exacerbated methylation defects, and glutathione deficiency manifesting in chronic pain.

1

3. Defendant refused Plaintiff's reasonable accommodation requests, made no individualized inquiry into her job duties or her disability-driven needs, and threatened to terminate Plaintiff if she continued making requests.

4. Santería is a religion that syncretizes Yoruban with Catholic beliefs. Under protection of the Catholic Church in Cuba, Santería thrived and is widely practiced in the Caribbean and Americas. Plaintiff, like many Santeros, is also a confirmed Catholic.

5. From June 2014 to June 2015, Plaintiff underwent training as a first-year priest (iyaworaje). Duties did not detract from essential duties as a professor. Defendant demanded Plaintiff delay her religious obligations, or her tenure would be jeopardized. Defendant also warned Plaintiff her religious duties would exacerbate her illness.

6. Fall 2014, a Macalester employee, Jane Doe (Doe) harassed Plaintiff by making multiple, unwanted requests for a romantic relationship. Doe and Plaintiff had had a prior, relationship, from late May-early June 2014, when Doe was an alumna of the College. When Plaintiff rejected her requests, Doe threatened to bring false allegations of harassment to the College.

7. May 2015, when Doe learned Plaintiff was going up for tenure review, she reported false allegations about Plaintiff, to the College.

8. Defendant launched an investigation. Macalester College Harassment Committee (MCHC) interviewed Doe and Plaintiff, on 2 June 2015.

9. MCHC findings, 8 June 2015, reported: College "policy does not address faculty relationships with alumni...nor does it outline parameters to consider when entering

romantic relationships with alumni." There was no evidence of "threat or coercion," and no "evidence that (Doe) experienced adverse educational or employment action as a result of their relationship."

10. 9 June 2015, MCHC Findings notwithstanding, Defendant charged Plaintiff with "sexual harassment."

11. 21 June 2015, Dean Jim Hoppe (Hoppe) emailed Plaintiff informing her he was adding a "sexual assault" charge.

12. Doe never alleged "sexual assault" in her reports to Defendant.

13. Defendant concealed Policy and proper procedures, refused Plaintiff's rights to know all allegations against her, to counsel, and to refrain from making statements.

14. In the Case Determination Letter, 27 July 2015, Murray's successor, Provost Karine Moe (Moe) admitted she ignored the MCHC findings. She manufactured a non-existent Policy, to terminate Plaintiff in retaliation for her repeated requests for reasonable medical accommodations, her religion, and sexual orientation.

15. Moe disparaged Plaintiff's religion in the letter.

16. Moe wrote, "Shame on you."

17. In front of Faculty Personnel Committee, Moe claimed Plaintiff preyed on students through poetry.

18. **29 September 2015, Defendant officially ended Plaintiff's employment.**

19. Defendant refused to pay Plaintiff's unemployment insurance. Plaintiff appealed.

20. On 5 February 2016, State of Minnesota Unemployment Insurance judge agreed, no College Policy prohibiting faculty-alumni relationships existed, and awarded Plaintiff benefits.

21. In the hearing, Director of Employment Services Bob Graf (Graf) admitted there was no Policy prohibiting faculty-alumni relationships.

22. Graf changed the reason for Plaintiff's termination, stating Plaintiff was <u>not</u> terminated for violating Policies against Harassment and Assault, but for "failing to maintain ethical boundaries with a student," a phrase that does not appear in any College Policy.

23. Defendant did not appeal the unemployment judge's decision.

24. Defendant violated Plaintiff's rights under the Americans with Disabilities Act, §504 of the Rehabilitation Act of 1973, Title VII of the Civil Rights Act of 1964, Title IX of the Civil Rights Act of 1972, 42 U.S.C. §1981, and Minnesota Human Rights Act, which prohibit discriminatory discharge and imposition of an objectively hostile work environment on account of  (a) disability discrimination because of her chronic Valley Fever, failure to accommodate reasonably her disability, retaliation and reprisal including discharge for seeking reasonable accommodations, (b) religious discrimination on account of her religion of Santería, (c) sexual orientation discrimination on account of her known status as a lesbian woman, (d) sex discrimination by way of disparate treatment in relation to similarly situated heterosexual male faculty members not subjected to discharge or hostile work environment for relationships with alumni, (e) race and ancestral

4

discrimination because of Plaintiff's Filipina and Puerto Rican ancestry, and (f) national origin discrimination because of Plaintiff's Filipina and Puerto Rican ethnicity.

25. Defendant caused Plaintiff to suffer from lost past income, lost present income, and lost future income as a tenured professor in academia. Her reputation as a person, poet and professor is permanently damaged, and her financial and physical health ruined. Plaintiff suffers physical and emotional trauma inflicted by Defendant's discrimination, shaming, and retaliation. She seeks all available legal and equitable relief from this Court, and demands a jury trial.

## JURISDICTION

26.   Plaintiff states claims that arise under the laws of the United States, in accordance with 28 U.S.C. §§1331 and 1343(a)(3-4).

27.   Plaintiff states supplemental claims under Minnesota law in accordance with 28 U.S.C. §1367.

28.   Plaintiff exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964.

29.   Plaintiff exhausted her administrative remedies under the Americans with Disabilities Act.

30.   Plaintiff received a right to sue letter from the U.S. Equal Employment Opportunity Commission dated 14 July 2016.

31.   Although Plaintiff requested cross-filing with the Minnesota Department of Human Rights in her Charge of Discrimination on 1 July 2016, Plaintiff did not receive a Charge of Discrimination or a Right to Sue Letter from the Minnesota Department of Human Rights.

32.   Plaintiff states claims under the Minnesota Human Right Act (MHRA) against Macalester College for discriminatory discharge on 29 September 2015 because of disability, reprisal for requesting reasonable accommodations, religious discrimination, sexual orientation discrimination, sex discrimination, race, and national origin discrimination.

33.   Plaintiff states claims for objectively and subjectively hostile work environment against Macalester College under the Minnesota Human Rights Act because of disability, reprisal for requesting reasonable accommodations, religious discrimination, sexual orientation, sex, race, and national origin discrimination, with the final act taking place on 29 September 2015.

## VENUE

34.  Plaintiff lays venue in the United States Judicial District and State of Minnesota because the substantial number of events of this lawsuit took place in Saint Paul, Ramsey County, Minnesota, and the Defendant has its headquarters and principal place of business at 1600 Grand Avenue, Saint Paul, Ramsey County, Minnesota 55105.

## PARTIES AND RESPONSIBLE OFFICIALS

35.   Plaintiff Kristin Naca is a renowned poet and professor, winner of the National Poetry Series prize, McKnight Fellow in poetry, Santería Priest, Consortium for Faculty Diversity (CFD) in Liberal Arts Colleges Fellow. In 2008, Macalester recruited her as a "minority hire," tenure-track Assistant Professor of poetry, for affirmative action purposes.

36.   Defendant Macalester College, a nonprofit corporation organized under the laws of Minnesota, with more than 500 employees, recipient of federal monies, is Plaintiff's former employer; Macalester is sued for the actions of its employees, officers, agents and representatives per *respondeat superior.*

37.   President Rosenberg is the chief executive of Macalester College. He oversees all promotional decisions as a member of the FPC with ultimate authority over appeals.

38.   Kathy Murray, former Provost and Dean of Faculty of Macalester, oversaw the tenure and promotion review processes, recruitment and retention of faculty. She was also responsible for College's compliance with federal law regarding discrimination and harassment.

39.   Karine Moe is current Provost and Dean of Faculty of Macalester.

40.   James Hoppe, former Dean of Students and Title IX Director, coordinated College response to harassment complaints and enforced College Policies against Harassment, including receiving allegations reports, notifying parties of allegations, Policy and procedure, scheduling investigations, and keeping record of sanctions.

41.   Lisa Landreman (Landreman), former Associate Dean of Students, served as chair of MCHC.

42.   Bob Graff is Macalester's Director of Employment Services.

43.   Adrienne Christiansen (Christiansen), Director of Center for Scholarship and Teaching (CST), oversees training through New Faculty Seminar (NFS) and "Talking about Teaching" series. She administers grants and internal research funds.

## BACKGROUND

44.   Macalester's mission highlights its commitment to "internationalism, multiculturalism and service to society."

45.   In 2010-11, then-English Chair, Prof. James Dawes (Dawes) recommended Plaintiff for early tenure promotion review. Murray ignored Dawes' requests.

46.   Dawes, a white, heterosexual, Christian male, was awarded early tenure with a Ph.D, a book, little teaching experience, and no service to the College or community. In comparison, Plaintiff has a Ph.D, MFA in creative writing, and M.A. in Linguistics, a book published by HarperCollins, won a prestigious, national poetry prize, demonstrated fifteen years of excellence in teaching, two at Macalester, contributed service to the Department and College, and built more than a decade of service to diverse communities.

## I. Center for Scholarship and Teaching (CST)

47.   In 2008, Defendant promoted Christiansen to Director of CST.

48. In September 2010, Plaintiff was excused from New Faculty Seminar (NFS) in exchange for department service.

49. Enraged, Christiansen sent Plaintiff harassing emails, verbally abused Plaintiff in her office, and threatened Plaintiff's employment.

50. Plaintiff reported the incident to Dawes. No measures were taken protecting Plaintiff from abuse.

51. In 2010-11, Christiansen harassed Plaintiff and others with hostile emails, remarks, and racist, required-reading assignments.

52. Christiansen's history with the College includes:

> i. attempting to block the tenure promotion of African American Professor of Communications Leola Johnson;
>
> ii. 2008, falsely reporting to Provost Murray that Prof. Ping Wang (Wang) was not qualified for the full professor promotion, which contributed to the denial of Wang's promotion;
>
> iii. 2009, harassing gay faculty member, Prof. Christopher Scott, for requesting Wallace travel funds;
>
> iv. 2011-12, discriminating against black, Rwandan Prof. Jean-Pierre Karegeye (Karegeye), during NFS, leading his chair to file a complaint on his behalf;
>
> v. resulting, Fall 2015, in Defendant's retaliatory termination of Karegeye at tenure review.

53.  2013, Dawes requested Plaintiff provide input on College-wide writing requirements for Christiansen. Plaintiff provided theory and structure that is widely accepted and practiced in Composition programs, to enhance diversity in classrooms. Christiansen vetoed the theory and imposed a pre-1970's pedagogy hostile to diverse students and faculty.

54.  February 2015, Christiansen harassed Plaintiff and Prof. Marlon James (James), who is black, gay, and Jamaican, after ice storms prevented them from giving a lecture at CST.

## II. Failure to Accommodate Plaintiff's Requests for Medical Leave

55.  From 2011-2015, Plaintiff was diagnosed with chronic, systemic Valley Fever. Her enervating, disabling, respiratory illness required frequent bed rest after teaching classes. Treatments and prescriptions averaged $13,000 per year in out-of-pocket expenses.

56.  In September 2012, Plaintiff requested accommodations for her disability. Murray refused to honor her doctor's request of 5 hours of office assistance.

57.  Dawes told Plaintiff her request for five hours per week of office assistance was "unprecedented, " therefore, College would not grant it.

58.  At no time did Defendant inquire whether Plaintiff could perform essential functions with or without reasonable accommodations, whether five hours per week of office assistance would pose an undue hardship upon Macalester, nor did Defendant inform Plaintiff that her requests impose undue hardship upon Macalester.

59. When Dawes, a white, heterosexual, Christian male reported his wife's illness in spring 2011, Defendant sent an email to English Department faculty and staff, excusing him from all non-essential duties, department meetings, and asking sympathy for his stress.

60. For comparison, Defendant never excused Plaintiff from non-essential duties, nor distinguished non-essential from essential duties, because of her disabling, life-threatening illness.

61. For comparison, Prof. Terry Krier (Krier), a white Christian requested accommodations for her migraines. Defendant installed incandescent lights in Old Main where she taught, at enormous expense, which far exceeded the cost of five hours of office assistance per week, for Plaintiff.

62. Dawes was granted paternity leave when his son was born. For comparison, Wang requested maternity leave, after she gave birth through caesarian section. Defendant denied her request.

63. Fall 2015, Dawes told his class he received College funds to take care of his ill father-in-law in Turkey.

64. Spring 2013, during her pre-tenure review meeting, Defendant targeted Plaintiff with "disorganization," though students praised her unilaterally for organization and course content.

65. Defendant routinely used "disorganization" to discriminate against faculty of color, disabled, gay, religious minorities: Wang, James, Naca, and Profs. Casey Jarrin (Jarrin) and Lara Nielsen (Nielsen) who suffered from brain tumor and brain trauma, respectively.

66. Macalester officials used Nielsen's tenure denial to warn Plaintiff that she, too, would be terminated for her disability at tenure.

67. After Plaintiff's pre-tenure meeting, Dawes instructed Plaintiff to speak to Graf to request a medical leave of absence.

68. Plaintiff was terrified to speak to Graf, because of the incidents of harassment and threats she had already experienced with Christiansen and Defendant's reluctance to provide her with (5) hours of office assistance.

69. Fall 2013, then-English Chair Krier made Plaintiff grade papers by students of marginalized groups, harassed by visiting professors, while Plaintiff was fighting her illness on sabbatical.

70. The work worsened Plaintiff's condition and she informed Krier that she was too ill to teach in spring 2014. Krier instructed Plaintiff to see Graf about medical leave of absence.

71. During their meeting, Graf threatened Plaintiff with termination for requesting reasonable accommodations for her disability, including leave of absence.

72. Graf refused Plaintiff's access to information and demanded a doctor's note, which Plaintiff had already submitted to Murray.

73. Plaintiff reported Graf's threats to Krier. Krier reported Graf's threats to Murray. Murray endorsed Graf's threats to Krier.

74. Krier repeated threats to Plaintiff, and Murray's endorsement.

75. Plaintiff submitted another doctor's note, requesting office assistance and time off during the day to enable her to recover from Valley Fever. Defendant ignored Plaintiff's request for medical leave of absence, again.

76. In academia, untenured, junior professors make accommodation requests through department chairs.

77. January 2014, Krier sent Murray the *New Yorker* article "Death Dust," asserting the severity of Plaintiff's condition, and reminding Murray of Plaintiff 's continued medical leave requests.

78. Late January 2014, after spring classes commenced, Murray met with Krier and Plaintiff, acknowledging Plaintiff's leave request, and refusing her reasonable accommodations requests, a third time.

79. Spring 2014, Murray, Krier and Plaintiff met again, to discuss Plaintiff's medical leave request. Murray suggested Plaintiff heal over summer and flip her teaching schedule from 3/2 (three courses in fall, two in spring) to 2/3, which was not an accommodation.

80. A fourth time, Murray refused Plaintiff's accommodation request.

81. May 2014, Murray interrogated Plaintiff about her illness.

82.   A fifth time, Defendant refused Plaintiff's medical leave.

83.   Plaintiff continued requesting medical leave through 2015, at #93-95.

## III. Persecution of Plaintiff's Sincere Practice of Santería

84.   June 2014, Plaintiff was initiated as a first-year priest in Santería (iyawo). Her pure white attire, head-to-toe, and use of a white umbrella outdoors, rain or shine, made her religious observance visible to others.

85.   11 July 2014, Murray warned Plaintiff that her religion would "interfere" with her tenure review and asked Plaintiff to "put off" her priest obligations.

86.   Murray also stated, "Won't it (your religious duties) be hard on your health?" demonstrating she regarded Plaintiff as disabled, by Valley Fever.

87.   During Plaintiff's iyaworaje, Krier was training as a Christian Chaplain. Defendant did not threaten Krier, nor ask her to delay training, as Defendant did Plaintiff. Neither Plaintiff's nor Krier's religious training required either one to miss any classes, change hours, or reduce essential teaching duties.

88.   2015, Landreman and Moe intentionally misspelled Iyawó, in Plaintiff's investigation and sanction documents (at #137.vi.).

## IV. Plaintiff Targeted for Termination at Tenure Review

89.   March 2015, Plaintiff met with Murray, then-FPC Chair Prof. Joan Ostrove (Ostrove), English Chair Prof. Daylanne English (English), and Associate Dean of the Faculty Prof. Kendrick Brown, to begin her tenure review process.

14

90.  Plaintiff fulfilled publication requirements specifically outlined by Murray at pre-tenure review.

91.  Murray stated Plaintiff's non-fiction publications would not count toward tenure promotion, though Plaintiff's appointment comprised .5 FTE (full time employee) creative writing, and .5 FTE literary criticism, which demonstrates Murray's plan to deny Plaintiff's tenure was premeditated.

92.  Spring 2015, Plaintiff reported Defendant's threats, harassment, and failure to accommodate her disability to English Department Chair Daylanne English.

93.  Former Provost Dan Hornbach provided English information Defendant would not: Plaintiff need only request medical leave for Murray to grant one.

94.  May 2015, English made requests for a medical leave on Plaintiff's behalf, until Murray conceded.

95.  June 2015, Murray ignored Policy, and rushed procedures, to expedite termination of Plaintiff under a false pretext. Defendant fabricated a sexual assault charge to mask discrimination.

## V. Assault as a False Pretext for Discrimination

96.  August 2014, Defendant hired an alumna, Jane Doe, who sought employment at the College to stalk Plaintiff.

97.   Following a brief, sexual relationship with Plaintiff, that took place while Doe was an alumna of Macalester, Doe continued requests for Plaintiff to renew the intimate relationship.

98.   As a Macalester employee, Doe harassed Plaintiff, in person and letters. After continued rejection, Doe threatened by email to bring a false complaint against Plaintiff to College officials.

99.   Plaintiff didn't report Doe's harassment because Defendant's repeated threats to her employment and tenure, over her disability and religion, led Plaintiff to believe that she would be terminated for reporting Doe's sexual harassment of her.

100.   14 January 2015, Doe's parents sent Plaintiff a letter threatening her career.

101.   28 March 2015, Doe threatened Plaintiff, her career, and disparaged her religion in a letter.

102.   May 2015, when Doe learned of Plaintiff's upcoming tenure review, she made false allegations against Plaintiff to College officials.

103.   Doe's parents followed with a defamatory letter to Rosenberg.

104.   Rosenberg, Murray, and Hoppe initiated an investigation through Macalester College Harassment Committee (MCHC).

105.   On information and belief after reasonable inquiry by Plaintiff, MCHC faculty members questioned the legitimacy of the investigation, because Doe was an alumna, and

never as a student, when she and Plaintiff had a relationship. Plaintiff's ombudsman, Jacki Betsworth (Betsworth) asked the same question.

106.   Hoppe and Landreman ignored the questions and moved forward with the investigation.

107.   1 June 2014, Betsworth asked Hoppe to clarify allegations. Hoppe did not.

108.   In MCHC interviews, 2 June 2015, Landreman attempted to steer parties to describe their post-graduation, consensual relationship as "sexual assault," asking Plaintiff: "Did you give (Doe) alcohol?" and "Were you aware (Doe) was a virgin?"

109.   Plaintiff was surprised by the scope and nature of questions, because she was not informed the consensual relationship was in question.

110.   On information and belief after reasonable inquiry by Plaintiff, MCHC faculty members refused to sign a document that:

    i.  redefined Policy, by treating an alumna as a student;

    ii. dismissed several occasions, after graduation, that Plaintiff assisted Doe with her career; and

    iii.    misspelled Plaintiff's name in Santería.

111.   On 8 June 2015, MCHC found:

    i.  the sexual relationship began after graduation, at Doe's initiation;

    ii. "no evidence of overt threat or coercion to be in a relationship";

17

iii. "no accusation or evidence that Doe experienced adverse educational or employment action as a result of their relationship while she was a student or in applying to graduate school";

iv. Plaintiff mentored Doe's poetry after graduation and after they had engaged in a relationship. Plaintiff wrote Doe a detailed recommendation, and offered advice about future study; and,

v. "Current policy does not address faculty relationships with alumni...nor does it outline parameters to consider when entering romantic relationships with alumni."

112. The MCHC findings were inconclusive in that there was insufficient evidence to determine whether or not sexual harassment had occurred, much less sexual assault.

113. On information and belief after reasonable inquiry by Plaintiff, 9 June 2015, notwithstanding MCHC findings, Murray and Hoppe drafted a letter, charging Plaintiff with sexual harassment, on which the Relevant Authority would rule.

114. The Relevant Authority was Murray.

115. On information and belief after reasonable inquiry by Plaintiff, Murray and President Rosenberg exchanged communications to discuss Plaintiff's non-tenuring and continued employment at the College.

116. 15 June 2015, Plaintiff received a letter that she was being charged with sexual harassment.

117.   On information and belief after reasonable inquiry by Plaintiff, 15 June 2015, Murray scheduled an FPC meeting, to review Plaintiff's termination, although Plaintiff had not received a report of her termination, and had yet to respond to charges against her.

118.   18 June 2015, Hoppe contacted Plaintiff by phone, to inform her a hearing before FPC was being scheduled for the end of June.

119.   Plaintiff responded, "The only reason for a hearing is that Mac is firing me. Doesn't Kathy (Murray) tell me I'm being terminated, first? That's the Policy."

120.   On 19 June 2015, 5:09PM, Hoppe emailed Plaintiff, revising MCHC Policy, so FPC could approve Plaintiff's surreptitious and swift termination.

121.   21 June 2015, 11:40 a.m., three weeks after Hoppe's original allegations report, and notwithstanding MCHC findings, Defendant added an after-the-fact allegation and charge of "sexual assault." Hoppe notified Plaintiff via email on a different subject, burying in the third paragraph:

> ...[O]ne clarification. The original letter you received (30 May 2015) indicated the alleged violation of the college policy on sexual harassment, but did not include indication of the alleged violation of the policy on sexual assault as it should have.

122.   Doe never alleged "sexual assault" in any report to Defendant.

123.   Macalester Policy states, "[I]n cases of sexual misconduct, the complaint resolution process detailed in the College's Sexual Misconduct Policy applies and supersedes any other process."

124.   Hoppe's after-the-fact disclosure of "sexual assault" violated Plaintiff's contracted rights of due process under the Sexual Misconduct Policy to:

    i.   timely notification of <u>all allegations</u>;

    ii.   counsel throughout all hearings and interviews;

    iii.  refrain from making self-incriminating statements; and,

    iv.  refrain from making any comments at all to officials.

125.   The "sexual assault" charge was a false pretext for the retaliatory termination of Plaintiff, for her medical leave and other reasonable accommodation requests, her homosexuality, and her religion.

126.   21 June 2015, 10:41PM, Hoppe emailed Plaintiff, again:

> *The MCHC has investigated the complaint. Now the Provost must make a recommendation about possible sanctions. If, after reviewing the MCHC file, you believe that there is additional information that the Provost should consider in deciding on sanctions, you may provide it to her. <u>This would include any information that you did not initially provide to the MCHC because you were not considering the possible application of the sexual assault policy</u> (emphasis added).*

127.   Hoppe's email demonstrates:

    i.   Plaintiff did not know of sexual assault allegations, prior to the MCHC interview, and not until 21 June 2015; and

    ii.   concealed that an FPC hearing had already been scheduled to review her evidently-intended sanction of termination.

128.   22 June 2015, Plaintiff and Betsworth reviewed the MCHC file, and found:

i. Doe never alleged sexual assault;

ii. Doe called her brief, consensual, sexual relationship as an alumna, with Plaintiff, a "little fling";

iii. Doe admitted to repeated requests for a relationship that Plaintiff rejected, while Doe was an employee of Macalester, and stated, "I didn't want it to end"; and

iv. Plaintiff provided documents as evidence Doe was harassing and threatening her from 2 October 2014 – 28 March 2015; and

iv. Doe's defamatory testimony to MCHC was preserved in transcript style; while, Plaintiff's testimony comprised disordered notes with numerous omissions in Plaintiff's defense.

129. 23 June 2015, as related by Betsworth to Plaintiff, Landreman told Betsworth that officials purposefully rushed the process: "[T]he process is different this time, because Kathy (Murray) leaves for Whitman (College) soon."

130. 24 June 2015, Betsworth sent a detailed emailed Hoppe and Landreman with her concerns about the unfair treatment of Plaintiff, including:

a. "sexual assault" allegations were not reported to Plaintiff, or Betsworth, prior to, or during, MCHC interview;

b. not knowing specific allegations prevented Betsworth from advising Plaintiff to seek her rights under the Sexual Misconduct Policy; and

c. notes of Plaintiff's testimony was not equal to Doe's transcript form, and contained omissions and inaccuracies.

131.   Betsworth and Plaintiff emailed Landreman four different times, requesting Landreman place Betsworth's email in the MCHC file.

132.   Landreman ignored each request, despite Hoppe's 21 June 2015 email to Plaintiff, "...you may provide ... any information that you did not initially provide to the MCHC because you were not considering the possible application of the sexual assault policy."

133.   In an email, 30 June 2015, 12:02 p.m., Landreman scolded Betsworth:

> i.   claiming, it was not Betsworth's place to advise Plaintiff of her right to refrain from making statements;
>
> ii.   admitting, Hoppe shared allegations of "harassment" and concealed "sexual assault" allegations from Plaintiff;
>
> iii.   obfuscating Hoppe's responsibility to immediately report all allegations;
>
> iv.   directing Betsworth and Plaintiff to incorrect Policy, knowing Sexual Misconduct Policy supercedes all policies if sexual assault is alleged;
>
> v.   stating, Plaintiff "should have known" the nature of the allegations, and planned her defense with or without her contracted rights;
>
> vi.   admitting, she took selectively-typed notes during Plaintiff's MCHC interview; and

vii.  explaining, she would review the MCHC file with the Relevant Authority, rather than let than let the MCHC report speak for itself.

134.   1 July 2015, Karine Moe took Murray's place as Macalester Provost.

135.   13 July 2015, Relevant Authority Moe informed Plaintiff that she was recommending termination, for violation of College Policies against Harassment and Assault. Moe gave Plaintiff one week to resign or proceed with a formal sanction hearing before FPC.

136.   20 July 2015, Moe replied to Plaintiff's request for an extension with an offer of a severance package, if Plaintiff resigned.

137.   27 July 2015, Moe and Hoppe handed Plaintiff the official Case Determination letter, which precedes the FPC hearing and final appeal.

138.   Dated 27 July 2015 the letter contained false and defamatory statements about Plaintiff. Stereotypes were used to defame and rule against Plaintiff. Moe:

    i. admits that she ignored the MCHC findings of fact, in particular that there is no Policy prohibiting relationships between professors and alumni; and

    ii.acknowledges that Doe initiated the consensual, physical relationship, and then willfully and deliberately disregards the facts, stating, "Regardless who initiated the contact..."

iii.     manufactures a homophobic, false, defamatory, and discriminatory representation of Plaintiff as engaging in predatory behavior of students by "creating the stage" for sexual activity to take place;

iv.     hypothecates a non-existent Policy prohibiting relationships between faculty and alumni; and thus

v. sets arbitrary standards for permissible faculty-alumnae relationships to discriminate against Plaintiff, and to protect known white, heterosexual male faculty who dated and/or married alumnae:

> _Certainly at some point and in some situations_ faculty members and students who have graduated are free to interact as peers, and even to enter into sexual activities, without being in violation of Macalester's sexual harassment or sexual assault policies. _One might imagine a hypothetical situation_ where a faculty member and a former Macalester student meet, become acquainted, and mutually agree to begin a relationship and become sexually intimate (emphasis added).

vi.     Moe misspells Plaintiff's name in Santería throughout the document.

139.   Moe placed Plaintiff on immediate, paid leave of absence, conveying she was a threat to the Macalester community.

140.   FPC reviews all promotion cases and all severe sanctions of faculty. Rosenberg sits on FPC as ultimate authority on personnel decisions for the College.

141.   Early August, then-FPC Chair Ostrove contacted Plaintiff to discuss the upcoming hearing, and Ostrove asked Plaintiff if she planned to bring counsel. Plaintiff reported she would bring an advisor and Betsworth. Ostrove said bringing two support persons seemed reasonable.

142.   The week prior to the FPC hearing, Plaintiff told Ostrove that her attorney would not accompany her. James would serve as faculty support person, and she would still bring two support persons, James and Betsworth.

143.   FPC tried to bar James, a gay, black, Jamaican, from the hearing:

> i.   FPC denied Plaintiff's and James' rights, claiming James' presence was a conflict of confidentiality;
>
> ii.   Learning that James knew the details of the case and had no contact with Doe before or after graduation, FPC, without reason, told Plaintiff that she would be allowed only one support person, and James could wait in the hallway;
>
> iii.   Plaintiff responded that she preferred James join her and Betsworth wait outside; and
>
> iv.   Then FPC responded, "There isn't enough seating," so, <u>Plaintiff is allowed no support people</u>;
>
> v.   Plaintiff shared the Policy with Ostrove, the evening before the hearing, and FPC finally permitted James and Betsworth.

144.   In attendance, 24 August 2015, were 2014-15 FPC members (minus one recusal), Rosenberg, Moe, Plaintiff, James, and Betsworth.

145.   Moe testified that Plaintiff had to be terminated <u>prior to tenure review</u> because she was "untenurable." Moe supported this argument by making false, defamatory and discriminatory claims, including:

i.    Moe falsely reported Plaintiff was Doe's "academic advisor," claiming Plaintiff built a close relationship with Doe over four years, to take advantage of Doe;

ii.   Plaintiff was not Doe's advisor, nor had she known Doe for four years, nor did Plaintiff initiate the sexual relationship with Doe, that took place after graduation and never while Doe was a student;

iii.   Moe claimed Plaintiff is a "creative writing professor" and "she makes her students emotionally vulnerable" by teaching them poetry;

iv.   James noted that Moe's remarks subjected all Creative Writing (CW) faculty to her defamation. Macalester's CW faculty is one of the most diverse, comprised of people of color, homosexuals, disabled faculty, and practitioners of non-Western religions. James also stated, Moe implied "...you been working on this woman for four years, grooming her. She's calling creative writers predators";

v.   Moe claimed, if Plaintiff earned tenure, "I am not confident Prof. Naca will not repeat this behavior in the future," putting the College at risk of legal punishments because Plaintiff was allowed to remain on faculty.

146.   Prof. Terry Boychuk (Boychuk), a straight, white, Christian male, was permitted to go up for tenure review, and was awarded tenure, despite multiple harassment complaints by then-incumbent Macalester students during his tenure review.

147.   Whereas, Moe claimed that Plaintiff was "untenurable," in order to cut short her tenure review.

148.   Moe's "untenurable" remarks interfered with Plaintiff's contract. Moe implied in testimony:

> i.  Plaintiff had the credentials to be awarded tenure, even with a false, defamatory harassment complaint in her file; and
>
> ii.  FPC would likely discount Doe's claims and award Plaintiff tenure, after considering the MCHC report and the copious exonerating evidence.;

149.   Three FPC faculty members submitted questions for Moe that implied termination was an overreaction.

150.   FPC upheld Moe's sanction.

151.   27 September 2015, the Appeals team admitted officials rushed the process, "completing the process before Provost Murray's departure would insure that the process proceeded expeditiously."

152.   No denial of promotion has been successfully appealed that resulted in overturning a promotion decision, at the College, in the last twenty years, negatively impacting people of color, women, ethnic, sexual, and religious minorities and those with medical disabilities at higher numbers.

153.   In October and November 2015, Defendant barred faculty of color from an FPC and Educational Governance and Policy Committee (EPAG) meetings, during which Plaintiff's case was discussed.

154.   By Defendant's own admission to the Unemployment Insurance Judge, on 5 February 2016, Plaintiff's last full day as a faculty member of Macalester College was 29 September 2015.

155.   Defendant refused to pay Plaintiff's unemployment insurance. Plaintiff appealed.

156.   5 February 2016, a State of Minnesota Unemployment Insurance judge agreed that no such College Policy prohibiting relationships between faculty and alumni existed and awarded Plaintiff unemployment benefits.

157.   In that hearing, Graf admitted there was no Policy prohibiting relationships between faculty and alumni. Graf offered a new explanation for Plaintiff's discharge, different from all past explanations, that Plaintiff was fired for "failing to maintain ethical boundaries with a student," even though Macalester gives faculty members money to entertain students at their homes.

158.   Defendant did not appeal the decision of the unemployment insurance judge.

## VI. Systematic Discrimination against Protected Classes

English Department:

159.   Defendant awards early promotion to English Department professors who are white, straight, male, Christian professors, with few publications, little teaching experience,

and no service. This list includes: Dawes, Stephen Burt, and John Parker. Dawes has been awarded two early promotions and an endowed Chair.

160.   Defendant delayed tenure review, or terminated, English faculty of color, gay, lesbian, disabled, and religious minorities prior to tenure review, or created such a hostile environment as to precipitate their leaving: James, Naca, Jarrin, Neil Chudgar, Soek-Fang Singh, and Don Lee (left due to hostile environment). When Wang complained to the EEOC, Defendant filed her served lawsuit.

161.   Defendant awards white, straight, male, Christian visiting professors in English similar special treatment. Matt Burgess was given a three-year contract as a visiting professor. John Lurie was renewed after students complained of his homophobic remarks. Visiting Professor Peter Bognanni was hired on to tenure-track and provided immediate, yearlong sabbatical.

162.   In comparison, Visiting Professors of color, gay, lesbian, women, disabled, religious minorities see their number of courses diminish or are not renewed. These include: James Cihlar, Sun Yung Shin, and Jennifer Kwon Dobbs.

## Systematic Discrimination against Members of Protected Classes and Retaliation against Those Who Report Misconduct

163.   Defendant claims in NFS that Macalester has raised publication standards for tenure promotion; however recently, Defendant continues to promote white, assistant professors without books at tenure review: Andrew Billings, Erik Davis, Cynthia Kauffeld,

Brian Lush, Erik Larsen, Gary Krueger, Amy Damon, Holly Barcus, Corey Hammers, Patrick Schmidt, Daniel Trudeau, Laura Smith, Kiarina Kordela, and others.

164.   In comparison recently, Defendant has mistreated several assistant professors of color, homosexuals, disabled, or practitioners of non-Western religions:

> i.   terminated assistant professors of protected classes <u>without books, prior to tenure review</u>: Neil Chudgar, Casey Jarrin, and Soek-Fang Singh (at third-year review though she had a book manuscript circulating and published soon after).

> ii. terminated assistant professors of protected classes <u>with books, prior to tenure review</u>: Plaintiff.

> iii. terminated assistant professors of protected classes <u>without books at tenure review</u>: Jean-Pierre Karegeye, Winston Kayan, Scott Morgansen, Harry Hirsch, Sarah Horton, Sarah Pradt, Jonathan Hu, and Nielsen. All were highly praised teachers and advocates for diverse students on campus.

> iv. <u>delayed tenure</u> of assistant professors of protected classes <u>with books</u>: James and Olga Gonazalez.

165.   Defendant created such a hostile environment as to precipitate the departure of assistant professors of color, homosexuals, disabled, or practitioners of non-Western religions: Dean of Race and Ethnicity Jane Rhodes, Christopher Scott, Lynn Hudson, Don Lee, Eugene Rogers, and Kanta Kochhar-Lindgren.

166.   Defendant awarded Dawes early promotion to full professor, without the support of his department. In comparison the same year, Defendant delayed Wang's promotion to full professor until after she filed a charge of discrimination with the EEOC. Wang had the support of her department.

167.   Defendant promoted Karine Moe to Provost and Dean of Faculty, while Defendant denied promotion to Provost and Dean of Faculty to Kendrick Brown (an African American) after he had successfully served as Associate Dean of Faculty for six years, under Murray.

168.   Defendant continues to cut FTE in departments that provide crucial curriculum in Domestic Diversity, even though the College is thriving financially and expanding in number of students every year since 2008, demonstrating disregard for the needs of diverse student populations. The English Department has been cut from (12) FTE to less than (10). American Studies has been cut from (3) FTE to (2).

169.   Defendant also assigned campus security to the courses taught by American Studies professor without permission or discussion.

170.   Macalester faculty and staff were demoted, terminated, or denied funding, in retaliation, for filing complaints of discrimination, safety and harassment, or for their support of others who filed complaints, including: Dean of Institute for Global Citizenship Christy Hanson, Director of the High Winds Fund Tom Welna, Jean-Pierre Karegeye,

Ping Wang, Daylanne English, Miriam Harris, Christopher Scott, Casey Jarrin, Marlon James, and Plaintiff.

171.   Recently, Defendant retired the position of Associate Chaplain of the Center for Religious and Spiritual Life, terminating the employment of K.P. Hong.

172.   Macalester students protested the termination of Hong. Defendant's response included: "As the college goes through this strategic planning, I'm sure that we will reconsider values and where we need staff, and I'm confident that we will be able to determine that a second Chaplain or diversity in the Chaplain's office is really important...That doesn't really help K.P."

173.   Defendant has several hundreds of millions of dollars in its endowment.

174.   Through her lawsuit, Plaintiff intends to bring to light the reality of intolerance, discrimination, and on-going misconduct by Macalester officials.

175.   The above actions of the Defendant inflicted the following damage upon Plaintiff:

> a.        lost past income of approximately $75,000 per year
>
> plus benefits as a non-tenured professor;
>
> b.        lost raise of 5% for gaining tenure;
>
> c.        lost career status as a tenured professor;
>
> d.        lost raises as a tenured professor of 2-3% per year
>
> conservatively;
>
> e. lost professional reputation;

32

f. past emotional distress, embarrassment and humiliation;

g. future emotional distress, embarrassment and humiliation;

h. increased medical expenses to address Valley Fever

176.   Plaintiff mitigated damages by gaining unemployment insurance from 10 February 2016 for twenty-six weeks, teaching poetry in Minnesota prisons, earning a McKnight fellowship for $25,000 in 2016, and continuing to write and publish poetry.

177.   Plaintiff has had to live off credit cards, borrowed monies, and savings of her spouse to survive since her discharge.

## CLAIMS

## A. Disability Discrimination

COUNT I, II, III, and IV: DISCRIMINATORY DISCHARGE BECAUSE OF DISABILITY -- ACTUAL AND PERCEIVED, IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, §504 OF THE REHABILITATION ACT OF 1973, TITLE IX OF THE CIVIL RIGHTS ACT OF 1972 WITH REFERENCE TO 34 C.F.R. §104.11-104.13, AND MINNESOTA HUMAN RIGHTS ACT

178.   Plaintiff realleges and reasserts each and every claim and averment above.

179.   Macalester College, a recipient of federal monies and employer of 500 or more persons, denied tenure to, and discharged Plaintiff from her tenure-track position as a poetry professor because of her actual and her perceived disability of Valley Fever on 29 September 2015.

180.   Macalester College discharged Plaintiff in reckless, conscious, or intentional disregard of her rights and safety as a disabled individual.

181.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

**COUNT V, VI, VII, and VIIII: FAILURE TO ACCOMMODATE PLAINTIFF'S ACTUAL DISABILITY OF VALLEY FEVER IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, §504 OF THE REHABILITATION ACT, TITLE IX OF THE CIVIL RIGHTS ACT OF 1972 WITH REFERENCE TO 34 C.F.R. §104.11-104.13, AND THE MINNESOTA HUMAN RIGHTS ACT**

182.   Plaintiff realleges and reasserts each and every claim and averment above.

183.   Macalester College failed to accommodate reasonably Plaintiff's known and actual chronic respiratory disability of Valley Fever, failed to make an individualized inquiry into her ability to perform the essential functions of her job, failed to make an individualized inquiry into whether any proposed accommodation imposed an undue hardship upon Macalester, and such failure to accommodate reasonably directly led to Plaintiff's denial of tenure and discharge from employment on 29 September 2015.

184.   Macalester College denied tenure and discharged Plaintiff in reckless, conscious, or intentional disregard of her rights and safety as a disabled individual.

185.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

**COUNTS IX, X, and XI: RETALIATION AND REPRISAL FOR REQUESTING REASONABLE ACCOMMODATIONS, CULMINATING IN DISCHARGE ON 29 SEPTEMBER 2015, IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, §504 OF THE REHABILITATION ACT OF 1973, AND THE MINNESOTA HUMAN RIGHTS ACT**

186.   Plaintiff realleges and reasserts each and every claim and averment above.

187.   Defendant Macalester College retaliated against, and took reprisal upon Plaintiff by discharging her from employment on 29 September 2015 because of her requests for reasonable accommodations of her chronic respiratory disability of Valley Fever, in violation of the Americans with Disabilities Act, §504 of the Rehabilitation Act of 1973, and the Minnesota Human Rights Act.

188.   Macalester College discharged Plaintiff in reckless, conscious, or intentional disregard of her rights and safety as a disabled individual.

189.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

COUNTS XII, XIII, XIV, and XV: OBJECTIVELY AND SUBJECTIVELY HOSTILE WORK ENVIRONMENT BECAUSE OF DISABILITY -- ACTUAL AND PERCEIVED - IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, §504 OF THE REHABILITATION ACT OF 1973, TITLE IX OF THE CIVIL RIGHTS ACT OF 1972 WITH REFERENCE TO 34 C.F.R. §104.11-104.13, AND THE MINNESOTA HUMAN RIGHTS ACT

190.   Plaintiff realleges and reasserts each and every claim and every averment above.

191.   Defendant Macalester College subjected Plaintiff to an objectively and subjectively hostile work environment on account of her known and actual chronic respiratory disability of Valley Fever, and materially and substantially degraded the terms and conditions of Plaintiff's employment as a poetry professor, culminating in her discharge on 29 September 2015.

192.   Macalester College subjected Plaintiff to an objectively and subjectively hostile work environment in reckless, conscious, or intentional disregard of her rights and safety as a disabled individual.

193.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

## B. Religious Discrimination

COUNTS XVI AND XVII RELIGIOUS DISCRIMINATION, IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND THE MINNESOTA HUMAN RIGHTS ACT

194.   Plaintiff realleges and reasserts each and every claim and averment.

195.   Macalester College denied tenure to, and discharged Plaintiff from, her tenure track position as a poetry professor because of her sincere belief and committed practice of Santeria, in violation of Title VII of the Civil Rights Act of 1964 and the Minnesota Human Rights Act.

196.   Macalester College denied tenure to, and discharged Plaintiff from, her tenure track position as a poetry professor because of her sincere belief and committed practice of Santeria in reckless, conscious, or intentional disregard of her deeply held and diligently practiced beliefs of conscience and religion.

197.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

**COUNT XVIII AND XIX: OBJECTIVELY AND SUBJECTIVELY HOSTILE WORK ENVIRONMENT BECAUSE OF RELIGION, IN VIOLATION OF TITLE VII AND THE MINNESOTA HUMAN RIGHTS ACT**

198.   Plaintiff realleges and reasserts each and every claim and every averment above.

199.   Macalester College subjected Plaintiff to an objectively and subjectively hostile work environment that materially and substantively degraded the terms and conditions of her employment as a poetry professor because of her religion, Santeria.

200.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

## C. Sexual Orientation

**COUNT XX: DISCRIMINATORY DISCHARGE BECAUSE OF SEXUAL ORIENTATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT**

201.   Plaintiff realleges and reasserts each and every claim and averment above.

202.   Macalester College denied tenure to, and discharged Plaintiff from employment because of her sexual orientation as a lesbian woman, in comparison to similarly situated, and less qualified male and heterosexual faculty members, who had relationships with former alumni and alumnae of Macalester College, and who were not disciplined or discharged for their relationships, and in comparison to a similarly qualified white female faculty member who had, and, on information and belief after reasonable inquiry by the plaintiff, has had, and continues to have, relationship(s) with incumbent Macalester students.

37

203.   Macalester College denied tenure to, and discharged Plaintiff from, her tenure track position as a poetry professor because of her sexual orientation in reckless, conscious, or intentional disregard of her rights as a member of a protected class under the Minnesota Human Rights Act.

204.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

COUNT XXI: OBJECTIVELY AND SUBJECTIVELY HOSTILE WORK ENVIRONMENT BECAUSE OF SEXUAL ORIENTATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

205.   Plaintiff realleges and reasserts each and every claim and averment above.

206.   Macalester College subjected Plaintiff to an objectively and subjectively hostile work environment that materially and substantively degraded the terms and conditions of her employment as a poetry professor because of her sexual orientation.

207.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

D. Sex Discrimination

COUNTS XXII, XXIII, and XXIV: IMPAIRMENT OF TERMS AND CONDITIONS OF EMPLOYMENT, INCLUDING DISCRIMINATORY DISCHARGE BECAUSE OF SEX, IN VIOLATION OF TITLE VII, TITLE IX OF THE CIVIL RIGHTS ACT OF 1972 INCORPORATING AND WITH REFERENCE TO 34 C.F.R. §106.51(a)(1-2), AND THE MINNESOTA HUMAN RIGHTS ACT

208.   Plaintiff realleges and reasserts each and every claim and averment above.

209.   Macalester College impaired the terms and conditions of her employment, denied tenure to, and discharged Plaintiff from employment because of sex, in comparison to similarly situated, and less qualified male and heterosexual faculty members, who did not labor under Plaintiff's campus service requirements and/or who had relationships with former alumni and alumnae of Macalester College, while not disciplined or discharged for their relationships.

210.   Macalester College impaired her terms of employment, denied tenure to, and discharged Plaintiff from, her tenure track position as a poetry professor because of her sex in reckless, conscious, or intentional disregard of her rights as a member of a protected class under Title VII, Title IX, and the Minnesota Human Rights Act.

211.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

### E. Race, Ancestry, and National Origin Discrimination

COUNT XXV: DISCRIMINATORY DISCHARGE IN THE MAKING AND ENFORCEMENT OF EMPLOYMENT CONTRACT BECAUSE OF RACE AND ANCESTRY -- FILIPINA AND PUERTO RICAN -- IN VIOLATION OF 42 U.S.C. §1981

212.   Plaintiff realleges and reasserts each and every claim and averment above.

213.   Macalester College denied tenure to, and discharged Plaintiff  from employment, and thus discriminated against her in the making, conduct, and enforcement of her existing employment contract because of race and ancestry as a Filipina and Puerto Rican, in comparison to similarly situated, and less qualified Caucasian faculty members, and in

comparison to a similarly qualified white female faculty member who had, and, on information and belief after reasonable inquiry by the plaintiff, has had, and continues to have, relationship(s) with incumbent Macalester students.

214.   Macalester College denied tenure to, and discharged Plaintiff from, her tenure track position as a poetry professor because of her race and ancestry in reckless, conscious, or intentional disregard of her rights in violation of 42 U.S.C. §1981.

215.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

## COUNTS XXVI AND XXVII: DISCRIMINATORY DISCHARGE BECAUSE OF RACE IN VIOLATION OF TITLE VII AND THE MINNESOTA HUMAN RIGHTS ACT

216.   Plaintiff realleges and reasserts each and every claim and averment above.

217.   Macalester College denied tenure to, and discharged Plaintiff from employment, and thus discriminated against her in the making, conduct, and enforcement of her existing employment contract because of race, in comparison to similarly situated, and less qualified Caucasian faculty members.

218.   Macalester College denied tenure to, and discharged Plaintiff from, her tenure track position as a poetry professor because of her race in reckless, conscious, or intentional disregard of her rights in violation of Title VII and the Minnesota Human Rights Act.

219.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

## COUNTS XXVIII, XXIX, AND XXX: IMPOSITION OF OBJECTIVELY AND SUBJECTIVELY HOSTILE WORK ENVIRONMENT BECAUSE OF RACE, IN VIOLATION OF 42 U.S.C. §1981, TITLE VII, AND THE MINNESOTA HUMAN RIGHTS ACT

220.   Plaintiff realleges and reasserts each and every claim and averment above.

221.   Macalester College subjected Plaintiff to an objectively and subjectively hostile work environment that materially and substantively degraded the terms and conditions of her employment as a poetry professor because of her race and ancestry.

222.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

## COUNTS XXXI AND XXXII: DISCRIMINATORY DISCHARGE BECAUSE OF NATIONAL ORIGIN IN VIOLATION OF TITLE VII AND MINNESOTA HUMAN RIGHTS ACT

223.   Plaintiff realleges and reasserts each and every claim and averment above.

224.   Macalester College denied tenure to, and discharged Plaintiff from employment, and thus discriminated against her in the making, conduct, and enforcement of her existing employment contract because of national origin, Filipina and Puerto Rican, in violation of Title VII and the Minnesota Human Rights Act, in comparison to similarly situated, and less qualified Caucasian faculty members, and in comparison to a similarly qualified white female faculty member who had, and, on information and belief after

reasonable inquiry by the plaintiff, has had, and continues to have, relationship(s) with incumbent Macalester students.

225.   Macalester College denied tenure to, and discharged Plaintiff from, her tenure track position as a poetry professor because of her national origin, in reckless, conscious, or intentional disregard of her rights in violation of Title VII and the Minnesota Human Rights Act.

226.   Macalester College inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

COUNT XXXIII: DISPARATE IMPACT DISCRIMINATION IN VIOLATION OF MINN. STAT. §363A.28 SUBD. 10 OF THE MINNESOTA HUMAN RIGHTS ACT (RELIGION, SEXUAL ORIENTATION, SEX, RACE, DISABILITY, AND NATIONAL ORIGIN), TITLE VII (RELIGION, SEX, AND NATIONAL ORIGIN), TITLE IX OF THE CIVIL RIGHTS ACT OF 1972 INCORPORATING AND WITH REFERENCE TO 34 C.F.R. §106.51(a)(1-2), AMERICANS WITH DISABILITIES ACT AND §504 OF THE REHABILITATION ACT OF 1973

227.   Plaintiff realleges and reasserts each and every claim and averment above.

228.   Macalester abused its Center for Scholarship and Teaching (CST), a campus institution facially intended to introduce new faculty members to campus resources for the purposes of career development and retention, by using it as a tool to intimidate and harass new non-Caucasian, non-heterosexual, and non-dominant religion and culture groupings; in other words, Macalester used CST to subject faculty members in protected classes under the ADA, §504, Title VII, Title IX, and the Minnesota Human Rights Act to objectively and subjectively hostile work environments that degraded, detracted, and discouraged

42

faculty members of protected classes in disparate proportions in relation to Caucasian and dominant society faculty members.

229.   Macalester used a facially neutral critique criterion, "disorganized", not for objective, constructive criticism of faculty, but for selectively applied criticism of faculty at the substantial and predominant expense of protected class faculty members.

230.   Plaintiff realleges and reasserts in paragraphs above to aver the existence of a Macalester policy of systematic disparate, discriminatory impact upon protected class faculty members, including the Plaintiff, including pay disparities that serve no bona fide, objectively reasonable business purpose, for the sake of retention of dominant society faculty and the termination, non-tenuring, and separation of protected class faculty members, whom Macalester claims to champion, recruit, and hold up for public praise.

231.   Macalester perpetuates this disparate impact by selective application of facially neutral policies, including Title IX, Tenure, Promotion, Appeals, Research Grants, in the favor of straights, whites, and Christians, at the expense of all other faculty and staff members, and refuses to apply its written policies fairly and uniformly to all cases.

232.   Macalester perpetuates this disparate impact upon protected classes by chronic budget cutting in department with already-diverse faculty and staff populations, specifically, those who teach domestic diversity classes, while leaving departments with predominantly straight, white, and Christian faculty and staff populations (e.g., all physical science department, mathematics department, and the political science department) largely free

from budget cuts; Macalester could reduce this disparate impact upon protected classes by spreading budget cutting across all departments, but refuses to do so.

233.   Macalester imposes pervasive, multilayered gatekeeping entities that are dominated by straight, white, and Christian faculty and staff members, including the CST, Faculty Personnel Committee, Educational Policy and Governance Committee, Employment Services Directorate, Macalester's Grant Office, Macalester Student Affairs including the Dean of Students, Title IX Enforcement, and Department Coordinators, to ensure that faculty and staff of protected classes must pass each gate to gain promotion or tenure.

234.   Macalester has no business necessity in enacting or practicing such facially neutral policies that create this pervasive, white-dominated gatekeeping system; to assure non-discrimination at all levels of faculty, staff, and studentry, Macalester can achieve effective governance and provision of a high-quality, academically challenging environment by promotion and inclusion of members of protected classes into position of real power in Macalester's organization, but Macalester refuses to do so, when there is no inherent factor that makes straight, white Christian staff and faculty more capable in positions of governance than members of protected classes.

235.   Macalester's systematic disparate impact upon protected classes directly contributed to the objectively and subjectively hostile work environment that Plaintiff endured, and directly contributed to the discriminatory, and retaliatory non-tenuring and discharge of Plaintiff.

236.   Macalester's systematic, discriminatory disparate impact inflicted past and future economic, noneconomic, and general damages upon Plaintiff.

## COUNT XXXIV: BREACH OF CONTRACT

237.   Plaintiff realleges and reasserts each and every claim and averment above.

238.   Plaintiff had a contract with Macalester College as a tenure track faculty Member.

239.   The contract included her salary, her schedule, the laws of the state of Minnesota, and all rules and regulations that governed the actions of Macalester College faculty, staff, and students, including the Macalester policies on relationships between faculty, staff, and students.

240.   Macalester College had no policy prohibiting relationships between employees and alumni.

241.   Macalester College had no policy deeming relationships between employees and alumni "inappropriate," let alone grounds for termination.

242.   Macalester College has policies governing investigations that alleged sexual assault, which provided staff and faculty members the right to know the particulars of the allegations at the beginning of an investigation -- not at the end, the right to obtain counsel in defense, and the right to stand silent in the face of accusations.

243.   Macalester breached its contract with Plaintiff by discharging her for having a relationship with an alumna, which Macalester does not prohibit.

244.   Macalester breached its contract with Plaintiff by Dean Jim Hoppe informing Plaintiff after the fact, after the MCHC had found no coercion, no educational impairment, no violation of an existing Macalester policy, and after Plaintiff had voluntarily disclosed materials to the MCHC, that the investigation was a sexual assault investigation.

245.   Macalester's breach of contract inflicted damages upon Plaintiff, including the loss of her tenure track job, loss of back pay, loss of her tenured career, regular raises as a tenured faculty member, benefits, and a career in academia -- a sum in excess of $2.4 million dollars, or such as the jury may award.

## COUNT XXXV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

246.   Plaintiff realleges and reasserts each and every claim and averment above.

247.   The elements of intentional infliction of emotion distress from MN CIVJIGS 60.75 are set forth with factual allegations below

248.

1. The conduct of (defendant) was so extreme and outrageous that it passed the boundaries of decency and is utterly intolerable to the civilized community, and

1) Defendant Macalester College, through the statements of Karinne Moe, that Plaintiff was a "predator" and was in a position to "prey" upon students, in the context of Plaintiff's discharge proceedings and denial of tenure proceedings, without any predicate allegation of sexual assault, and with denial of Plaintiff's rights under Macalester's existing sexual misconduct policies, alleged such a serious offense against the law without objective basis in fact, and with knowledge that no basis existed, was extreme, outrageous, and outside the bounds of human decency;

2. The conduct was intentional or reckless;

46

2A) Provost Moe's communication to the FPC members was intentional and made without a proper purpose, with actual knowledge that no allegation of sexual assault was made against Plaintiff, or made with reckless disregard as to its veracity, and made with actual knowledge, or substantial certainty of the harm that such statement would inflict upon Plaintiff;

3. The conduct caused emotional distress to (Plaintiff);

3A) The conduct by Macalester's and Moe's communication inflicted severe emotional distress upon Plaintiff; and

4. The distress was so severe that no reasonable person could be expected to endure it.

4A) No reasonable person can endure being falsely accused of being a sexual predator without suffering significant harm in the midst of one's professional, social, academic, faith-based, or personal community.

249.   Defendant's actions inflicted damages upon Plaintiff.

## WHEREFORE PLAINTIFF PRAYS FOR THE FOLLOWING RELIEF:

A.   Judgment for the Plaintiff against the Defendant;

B.    Back pay from 29 September 2015 to the present;

C. Reinstatement, or, in the alternative, where reinstatement is not feasible, front pay of $2.4 million to compensate plaintiff for lifetime of lost tenured faculty status in academia, inclusive of health, pension, and other benefits;

D.   Damages for past emotional distress in excess of $75,000, or such sum as the jury may award;

E.   Damages for future emotional distress in excess of $75,000, or such sum as the jury may award;

F.   Punitive damages to the fullest extent allowed by Title VII, the ADA, and 42 U.S.C. §1981, in excess of $75,000, or such sum as the jury may award;

G.  Punitive damages to the fullest extent allowed by the Minnesota Human Rights Act, in excess of $75,000, or such sum as the jury may award;

H.   Trebling of all above damages in accordance with the Minnesota Human Rights Act;

I.    Civil penalty in excess of $75,000, or such sum as the jury may award;

J.   Costs and disbursements;

K.  Pre-verdict interest;

L.   Post-judgment interest;

M. Reasonable attorney fees in accordance with 42 U.S.C. §1988 and the Minnesota Human Rights Act;

N.   Reasonable expert witness fees in accordance with the Minnesota Human Rights Act;

O.   Retraction and correction of all communications alleging Plaintiff was fired for sexual assault for sexual assault or sexual harassment; and

P.   All other legal or equitable relief appropriate under the circumstances.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS TRIABLE TO THE JURY.

## VERIFICATION

I, Kristin Naca, in Hennepin County, State of Minnesota, in accordance with 28 U.S.C. §1746, hereby declare, under penalty of law, that the above allegations and averments, except those made on information and belief, and with the exception of titles of causes of action provided by my attorney, are true to the best of my present knowledge.

Date: _9 October 2016_

_____

Kristin Naca, Plaintiff

49

Reviewed and signed in accordance with Fed. R. Civ. P. 11 and Minn. Stat. §549.211.

Date: 9 October 2016        Respectfully:

PETER J. NICKITAS LAW OFFICE, L.L.C.

/s/ *Peter J. Nickitas* (electronically signed)

_____

Peter J. Nickitas, MN Att'y #212313
Attorney for the Plaintiff
431 S. 7th St., Suite 2446
Minneapolis, MN 55415
651.238.3445/FAX 1.888.389.7890
peterjnickitaslawllc@gmail.com

I, Peter J. Nickitas, attorney for the plaintiff, hereby certify that this amended complaint comprises 9,641 words according to 2008 Microsoft Office in 13 point Baskerville Old Face typeface, counting all words from "Introduction" to "Plaintiff demands trial by jury on all claims triable to the jury".

Date: 9 October 2016                    Respectfully:

/s/ *Peter J. Nickitas*

_____

Peter J. Nickitas

50