| | |
|---|---|
| KRISTIN NACA, | Case No. 16-CV-3263 (PJS/BRT) |
| Plaintiff, | |
| v. | ORDER |
| MACALESTER COLLEGE, | |
| Defendant. | |

Peter J. Nickitas for plaintiff.

Sean R. Somermeyer, Kathlyn E. Noecker, and Terran C. Chambers, FAEGRE BAKER DANIELS LLP, for defendant.

Plaintiff Kristin Naca was employed as a "Faculty Diversity Fellow" and then as an assistant professor of poetry by defendant Macalester College ("Macalester").  Her career at Macalester progressed smoothly until May 2015, when Jane Doe,[1] a 2014 graduate of Macalester, reported that Naca had solicited sex from her shortly before she graduated and began a sexual relationship with her shortly after she graduated.  During Macalester's subsequent investigation, Naca admitted that she had invited Doe to her home a couple of weeks before Doe's graduation to discuss what Naca perceived as sexual tension between them and, during that discussion, had offered to "make a pass" at Doe.  Naca further admitted that, three days after Doe graduated, Naca had again

---

[1]Jane Doe is a pseudonym.

invited Doe to her home, where the two engaged in the first of what became multiple sexual encounters. Macalester terminated Naca after conducting a formal investigation, holding a hearing, and putting the matter through several layers of review.

Naca responded by suing Jane Doe and her parents in state court for defamation and other claims. The parties eventually settled that lawsuit. While her state-court lawsuit was pending, Naca brought this action against Macalester in federal court, filing an 81-page complaint asserting 30 claims.[2] The Court struck Naca's initial complaint for failure to comply with Fed. R. Civ. P. 8 and ordered Naca to file an amended complaint of no more than 10,000 words. ECF No. 6. Naca responded by filing a 50-page amended complaint alleging 35 claims, including 26 discrimination or hostile-environment claims based on race/ancestry, national origin, sex, sexual orientation, disability, and religion. ECF No. 8. The Court dismissed about two-thirds of Naca's claims as implausible, ECF No. 64, and Naca later voluntarily dismissed her claim for intentional infliction of emotional distress, ECF No. 100.

This matter is before the Court on Macalester's motion for summary judgment on Naca's remaining claims of (1) discrimination on the basis of race/ancestry, national origin, sex, sexual orientation, disability, and religion; (2) failure to accommodate

---

[2]The last two counts were mislabeled "Count XXV" and "Count XXVI." ECF No. 1 at 72. They should have been labeled "Count XXIX" and "Count XXX."

disability; and (3) breach of contract.  For the reasons that follow, Macalester's motion is granted and Naca's remaining claims are dismissed.

## I. BACKGROUND

Before turning to the facts underlying the parties' dispute, the Court pauses to note that it has been unusually challenging to determine whether Naca's version of events is supported by evidence in the record because of two unfortunate tendencies of her counsel:  First, he frequently asserts facts in his briefs with no record citation or with a citation to something that does not support the assertion (and may, in fact, be completely irrelevant to the assertion).  Second, he often cites to the record in a manner that does not match the manner in which he organized his evidentiary submissions, making it difficult (and occasionally impossible) to locate the document or part of a document to which he is ostensibly referring.  At oral argument, Naca's attorney offered a citation guide that cross-references citations by docket number and page, but that document itself has a number of citation errors and covers only a limited portion of the record.

These two tendencies have combined to considerably slow the Court's progress through the record.  Often, the Court has had to spend an inordinate amount of time trying to locate a document that Naca's counsel cites—and then, having found the document, the Court has had to spend more time trying to decide if Naca's counsel

truly meant to cite the document. All in all, the inability of Naca's attorney to submit

and cite to his exhibits in a coherent and accurate manner has caused the Court to waste

dozens of hours of its time.

Having done its best to locate all of the evidence that supports Naca's claims, the

Court will now proceed to describe Naca's version of events. The Court notes that

Naca's version of events is strongly disputed by many of the people who will be

mentioned in this order. For purposes of deciding Macalester's motion for summary

judgment, however, the Court is required to treat Naca's version as true and draw all

reasonable inferences in her favor.

### A. Naca's Career at Macalester

In 2008, shortly after getting a PhD in English, Naca accepted a position as a

Faculty Diversity Fellow at Macalester. App. 18-19 (22-25).[3] She later accepted a

tenure-track position in the English Department as an assistant professor of poetry.

App. 24-26 (47-48, 51-52, 55-56).

#### 1. Accommodation Requests for Academic Year 2012-13

Naca was diagnosed with Valley Fever in 2012. App. 82 (277). In September

2012, Naca informed Jim Dawes, that year's department chair, that her doctor had told

---

[3]All citations to "App." are to the appendix that Macalester submitted in support
of its motion. Where the appendix page reproduces multiple pages of a condensed
deposition, the Court provides a pincite in parentheses.

her that she needed ten hours of office assistance per week. App. 27 (60). Dawes told Naca that ten hours of assistance per week would be unprecedented and that she would not get that many hours. App. 27-28 (60-62). He also said that other professors who were denied tenure might claim that Naca received an unfair advantage and sue Macalester on that basis. App. 28 (61-62). Dawes and Naca agreed that she would request five hours instead. App. 27 (60).

Naca emailed Kathleen Murray, Macalester's provost, to request five hours. App. 28 (63); App. 30 (70). Murray asked Naca for a note from her doctor. App. 30 (70-71); App. 90. Naca provided the note, which stated that, due to her medical condition, Naca "requires administrative assistant; may require one to two hours off for rest in afternoon."[4] App. 32 (77-78); App. 90. A few days later, Murray told Naca to "go ahead and find a student to help you for a couple of hours each week." App. 93. Naca responded that "[t]here may be a student worker who needs a few more hours. Which is all I need." App. 93. Murray formally approved one to two hours of administrative assistance for the fall of 2012 and stated that "[w]e will reevaluate the situation prior to the start of the second semester." App. 98.

Naca was not satisfied with Murray's response and complained either to Dawes or to another senior faculty member at some unspecified time that she was not given the

---

[4]The record copy of the doctor's note is only partially legible. *See* App. 96.

full five hours that she had requested.  App. 31 (73-74).  She also testified that she asked "work study" if she could get more hours but she "usually got one to two hours of office assistance."  App. 31 (73).  Naca did not raise the issue with Murray or anyone from the employment-services department, however.  App. 31 (74-75).

In late September 2012, Naca asked Kendrick Brown, an associate dean, for a "short extension" of the deadline for submitting her pre-tenure review materials.[5] Nickitas Decl., Feb. 7, 2018 (hereinafter "Nickitas Decl.") Ex. 7.  Brown offered her an extra day and Naca indicated that that was acceptable.  *Id.*; App. 32 (79-80).  A few days later, Naca asked for more time.  Nickitas Decl. Ex. 7.  Brown contacted Murray to ask how to handle the request, and Murray replied that Naca should talk to Murray because they "need to go through more formal processes."  *Id.*  Naca did not talk to Murray; instead, her department chair, Dawes, stepped in to "[run] interference" for Naca by writing to Brown.  App. 32 (80).  The outcome of Dawes's involvement is unclear; according to Naca, the issue "wasn't discussed any further" and she turned in her materials without getting another extension.  App. 33 (81).  Naca successfully completed

---

[5]The pre-tenure review process typically takes place during the faculty member's third year.  App. 521 (26).  Faculty members who are undergoing pre-tenure review put together a dossier that includes their curriculum vitae, a professional-development plan, examples of their scholarship, teaching evaluations, and other materials.  App. 521 (26-27).  If the faculty member passes pre-tenure review, her contract is renewed for another three years.  App. 521 (27).

pre-tenure review in the spring of 2013, and the tenure-review committee told her that she was a strong candidate for tenure.  App. 33 (81); App. 35 (89); App. 62 (196).

In January 2013, Dawes emailed Naca about research assistance to "make sure that the arrangement is working out for you" and "see if you want to continue with the same plan for the semester or want to do something more or different."  App. 100. Dawes also mentioned that Naca could seek help from Bob Graf, the employment-services director.  App. 100.  Naca told Dawes that she wanted to keep the same plan. App. 34 (85).  Naca testified that she received one to two hours of research assistance from the English Department, but that she did not receive office assistance and is not sure whether she asked for it.[6]  App. 34-35 (86-89).  Naca does not recall requesting any other assistance for the spring of 2013.  App. 34 (88).

_____

[6]Naca testified that there is a distinction between *research* assistants and *office* assistants.  App. 34 (86, 88).  But the record is often inconsistent or confusing as to which type of assistance is under discussion.  For example, Naca seems to agree that she received office assistance in the fall of 2012, App. 35 (89), but Dawes's January 2013 email inquires about continuing with the research assistance that she received the previous semester, App. 100.  In addition, the English Department employs student workers who are generally available to faculty for "office support tasks and extra assistance on projects as needed and appropriate."  App. 695-96 ¶ 4.  Jan Beebe, the department coordinator, avers that she arranged for one of these workers to assist Naca every semester, from fall 2012 forward, with the exception of fall 2013 when Naca was on sabbatical.  App. 696 ¶ 6.  It is unclear to the Court whether the assistance that Beebe arranged would be considered office assistance or research assistance or both.

2.   Accommodation Requests for Academic Year 2013-14

In April 2013, Naca met with Dawes to ask for a "medical leave" because she was having difficulty concentrating and writing poetry.  App. 35-37 (92-94, 96-97).  Naca did not specify what she meant by the term "medical leave."  App. 36-37 (93-99).  Naca views the term as broad enough to encompass intermittent leave (ranging from an hour or two to a day or two) when necessary, a course reduction, or an entire semester away from teaching.  App. 36 (93-95).  She did not have a particular type of "medical leave" in mind when she spoke to Dawes.  App. 37 (98-99).  Dawes agreed that Naca should request medical leave (it is also not clear what Dawes meant by "medical leave") and told her to talk to Graf when she was ready.  App. 37 (97, 99).

Naca took a sabbatical in the fall of 2013.  App. 35 (89).  While on sabbatical, Naca contacted that year's department chair, Terry Krier, to let Krier know about her health issues and her intent to meet with Graf at some point.  App. 38 (103); App. 106-07.  Krier agreed that Graf would be "the right person to get in touch with" and told Naca that "[i]f you eventually think you need to take time off, and/or defer tenure processes, that's important to try to get on top of, both for you and for me."  App. 106.  Sometime after this email exchange, Naca told Krier that she would probably need to take an entire semester of medical leave because she was experiencing terrible pain.  App. 39 (105-06); App. 44 (126-28).  On October 31 (while still on sabbatical), Naca

notified Krier that she planned to contact Graf because she was worried about getting through the next semester.  App. 109.  Krier told her not to hesitate to request leave.  App. 109.

Naca met with Graf on November 4, 2013 to discuss medical leave.  App. 40-41 (109, 114).  Naca told Graf that she needed to take a medical leave for the upcoming semester (spring 2014) and asked for copies of the leave form and written policy.  App. 41-42 (113-17); App. 44-46 (126-36); App. 84 (284-86).  Graf provided Naca a general accommodation form, but did not provide a leave form or written policy.  App. 41-42 (113, 115-17).

Graf made several comments during the meeting that Naca perceived as threats.  For example, Graf said that if Naca couldn't do her work, then Macalester would have to find someone who could and that maybe Naca shouldn't work at Macalester anymore.  App. 40 (110-11).  Toward the end of the meeting, they discussed how Graf could help Naca obtain some type of leave or other accommodation.  App. 115.  Graf advised Naca that this was just the beginning of the process "depending on what [her] doctor requests for accommodations . . . ."  App. 115.  (Macalester's leave policy requires medical certification for any medical leave that lasts three or more days.

App. 339.)  Graf also directed Naca to online information about available

accommodations and the Family and Medical Leave Act ("FMLA").[7]  App. 700 ¶ 8.

Naca's doctor completed the accommodation form on November 14, 2013 and

Naca turned it in to Graf.  App. 42 (119-20); App. 119.  In the space provided for

identifying the requested accommodation, the doctor wrote, "Kristin may need extra

time (time and 1/2) to complete assignments & tasks, & would benefit from a research

assistant 2-4 hours per week.  She may need 1-2 days off per week during worst time of

illness."  App. 119; App. 42 (120).  The form also stated that Naca "is now making rapid

but incremental improvements & may totally recover in 18-24 months."  App. 119.

Consistent with this request, the doctor's visit report for November 14 recorded that "if

[Naca] gets the help of a research assistant three to four hours a week then she is able to

get all of her essential tasks done that are required for her job in teaching."  App. 735.

The note also recorded "rapid" and "marked" improvement.  App. 735.  Under "plan,"

the report stated that "she will need a research assistant three or four hours per week"

and that "[s]he might need one or two days off per week during the worst times of her

illness."  App. 736.

_____

[7]In her brief, Naca denies that Graf directed her to online information about the
FMLA or anything else.  ECF No. 231 at 9 n.44.  But Naca cites no evidence (not even
her own testimony) to support this assertion.

In December 2013, Graf called Naca's doctor for more information.[8]  App. 732.

The doctor stated that Naca required one to two hours' rest most afternoons; one to two

days off (intermittently and as needed) when she became exhausted; and four hours of

office assistance (presumably per week).  App. 732.  In his notes regarding that phone

call, Graf wrote "FMLA designation—yes," indicating Graf's conclusion that, if Naca

were to later request leave, her illness likely qualified as a "serious health condition" for

purposes of the FMLA.[9]  App. 701 ¶ 11; App. 710; *see* 29 U.S.C. §§ 2611(11),

2612(a)(1)(D).

Graf notified Naca that her request for two to four hours of student assistance

per week was granted for the spring 2014 semester.  App. 121.  Naca characterizes

Graf's note granting her request for student assistance as a denial of her request for

———————————

[8]In her brief, Naca asserts that Graf called her doctor twice.  ECF No. 231 at 9.
Both Graf and the doctor identify only one phone call, however, and the doctor
explicitly asserted that she spoke with Graf only once.  App. 700-01 ¶¶ 9-10; App. 733
¶ 12.

[9]Naca contends that she was never told that she was eligible for FMLA leave.  In
her email to Krier about her meeting with Graf, however, Naca stated that she and Graf
discussed "how [Graf] could help me establish either protected or unprotected leave, or
other accommodations."  App. 115.  It seems likely that "protected" leave is a reference
to the FMLA.  *See* App. 598 (52-53) (testimony about Macalester FMLA policy regarding
whether leave is "designated as FMLA protected").  Regardless, as discussed below,
whether or not Graf or anyone else told Naca that her illness qualified as a "serious
health condition" is irrelevant, as Naca cannot show that she ever became "unable to
perform the functions of [her] position" and thus needed medical leave.  29 U.S.C.
§ 2612(a)(1)(D).

leave, presumably because it did not address the issue of intermittent time off.

According to Graf, though, he did not address this request "because faculty largely

control their own schedules and have ample unscheduled time during the day and

week when rest can occur." App. 702 ¶ 13.  This assertion is supported by the record;

during the 2014 spring semester, Naca taught on Tuesdays and Thursdays for a total of

six hours each week.  App. 725 ¶ 14.  Including office hours and other duties, her total

scheduled time during the week was about 20 hours.  App. 84 (283-84).

Shortly after her November 4 meeting with Graf, Naca complained to Krier about

Graf's threatening comments; at the time, however, she said that she was "not expecting

[Krier] to do anything."  App. 114.  A few months later, Naca asked Krier to follow up

with Murray about Graf's threats and about Naca's request for medical leave and "any

other accommodation requests that I made."  App. 40 (110-11); App. 44 (125); App. 47-

48 (140-42); App. 58 (179-80); Nickitas Decl. Exs. 13, 15.  Krier related these requests to

Murray, who responded that Graf was doing his job by asking Naca questions.  App. 48

(143-44).  Murray and Naca agreed, however, that Naca could communicate with

Murray instead of Graf about her needs for accommodation.  App. 50 (149).

3.  Accommodation Requests for Academic Year 2014-15

In April 2014—near the end of her first semester back from sabbatical—Naca met

with Krier and Murray to discuss the state of her health.  App. 48-49 (142, 146).  Naca

told Krier and Murray that she was experiencing "debilitating fatigue" and "incredible difficulty" reading and retaining information, and that she needed to rest as much as possible for multiple days in a row. App. 49 (147-48). They discussed whether Naca's fall 2014 course load could be reduced and whether that could be accomplished by flipping her fall and spring schedules.[10] App. 49-50 (148-50). Naca was told that they would discuss a one-course reduction for spring 2015 if she still needed it at that time. App. 49 (148); App. 123. At some point during the spring of 2014, Naca also asked Krier for medical leave for the upcoming fall semester. App. 58 (179-80).

It is unclear what became of these discussions about medical leave and reducing or restructuring Naca's course load. Consistent with the original schedule, Naca taught three courses in the fall of 2014 and two in the spring of 2015. App. 725 ¶¶ 15-16. Prior to the fall 2014 semester, however, Naca asked for and received a lighter laptop computer to accommodate her fatigue. App. 133; App. 52 (160).

In August 2014, Daylanne English, the department chair for the upcoming year, emailed Naca to ask if she needed a research assistant and to inquire whether having a work-study student for office assistance had been sufficient for her needs. App. 135. Naca responded that she did not need a research assistant but wanted to continue to

---

[10]Macalester faculty normally teach a total of five courses per year. Naca was scheduled to teach three courses during the fall of 2014 and two during the spring of 2015. App. 602 (67); App. 123.

receive office assistance, explaining that Jane Doe had worked three to four hours per week the previous semester.  App. 135.  English said that it would be fine for Naca to employ a new office assistant for three to four hours per week, and Naca received the requested assistance.  App. 135-36; App. 696-97 ¶ 6.  Later that fall, Naca asked for her classes to be scheduled all in the same building to reduce the amount of walking that she had to do.  Macalester agreed.  App. 53 (163-64).

In December 2014, Naca's doctor wrote a letter stating that Naca's prognosis was excellent, that the doctor expected "near complete recovery" by November 2015, and that until then Naca "may continue to need an administrative assistant and occasional time off in the afternoon to rest and recover."  App. 144.

4.  Naca's Religious Training

Naca is a practitioner of Santeria.  App. 50 (152).  In the summer of 2014, soon after she had told Krier and Murray that she was experiencing "debilitating fatigue" and feared that she would have difficulty meeting her responsibilities at Macalester, Naca decided to undertake the training necessary to become a Santeria priestess. App. 50 (151-52); App. 128.  Naca notified Murray that, during the first year of her training, her "life, or roles, in public will be significantly diminished or limited." App. 128.  In light of this, Murray and Naca met in July 2014 to discuss how the training would impact her job.  App. 51 (156).  Murray told Naca that the training was a big

undertaking and that she probably should not undertake it that year because it could

jeopardize her tenure.  App. 52 (157).  Murray also asked how it would affect Naca's

health.  App. 52 (157-58).  Naca told Murray that she was undergoing the training to

help with her illness.  App. 52 (157-58).  In her notes from the meeting, Murray stated:

"After listening to her description of what she is doing, I do not think it should interfere

with that [tenure] preparation."  App. 131.

 5.  Tenure Review and Accommodation Requests for Fall 2015

As noted, Naca successfully underwent pre-tenure review in spring 2013.

Tenure review typically takes place three years later, App. 521 (27), which means that

Naca would be up for tenure during the 2015-16 academic year.[11]

On March 13, 2015, Naca participated in an informational meeting to discuss the

tenure-review process.  App. 60 (187-88); App. 146.  Later that day, Naca requested a

"course release"—meaning that she would teach one fewer class—for the fall 2015

semester.  App. 60 (190).  In May 2015, Murray met with Naca to explain the necessary

---

[11]During her deposition, Naca testified that she was denied early tenure review
and that Murray and others had suggested that she delay the tenure-review process for
health reasons.  In her brief, however, Naca does not attempt to establish a prima facie
case of discrimination based on these allegations.

documentation. App. 61 (191-92); App. 151. Naca understood that her request for a course release would be approved. App. 61 (192).[12]

In her brief, Naca also claims that, at the same May 2015 meeting with Murray, Naca requested, and was denied, a research assistant; Naca further claims that she had to pay for her own research assistance from 2014 forward. ECF No. 231 at 11. The part of the record that Naca cites does not support her claims.[13] There is evidence that, in May 2015, Naca sought to have a particular Macalester student continue to assist her after the student graduated. App. 507 (56-57). But because work-study funds cannot be used to pay alumni, Daylanne English, the department chair, looked into whether alternative sources of funding could be used. (English herself had previously used faculty research funds for a similar purpose.) App. 507-08 (57-58). English asked Murray, who told English to go through the employment-services department.

_____

[12]Naca now claims that this request was still pending at the time of her termination in September 2015. ECF No. 231 at 11. The testimony that Naca cites for this proposition describes the notes from the May meeting with Murray. Those notes merely say that Murray "walked through the documentation that Jason would need to arrange for a course release" in the fall. App. 604 (74); Nickitas Decl. Ex. 19.

[13]To support her claim that she paid for her own research assistance, Naca cites "Macalester Bates 80:17-81:14." ECF No. 231 at 11 n.65. This appears to be a garbled reference to pages 80 and 81 of the deposition of Daylanne English. These pages of testimony do not provide evidence that Naca paid for her own research assistance, however. Rather, Naca's counsel asked if English was aware that Naca paid for her own research assistant in the summer of 2014, and English testified that she did not know where the funding came from. App. 513 (80-81). Obviously, the questions of Naca's attorney are not evidence.

App. 507-08 (57-58). As far as English was aware, the employment-services department denied the request. App. 508 (58).

As part of the tenure-review process, Macalester solicits evaluations from all of the candidate's former students. App. 521-22 (26-28, 31-32). It was apparently this solicitation that prompted Jane Doe to come forward with the sexual-misconduct complaint that would eventually result in Naca's termination. App. 714.

### B. Naca's Relationship with Doe

Doe graduated from Macalester in May 2014. While at Macalester, Doe majored in English, and she studied under Naca for three years. App. 192; App. 231. During her final semester at Macalester, Doe worked as Naca's assistant and took Naca's capstone class. App. 200.

At Naca's invitation, Doe went to Naca's home on May 6, about a week and a half before graduation.[14] App. 237. According to Doe, she assumed that they were

---

[14]During Macalester's investigation, Naca and Doe both consistently identified May 6 as the date of this meeting, and neither objected to or corrected the explicit references to that date in Macalester's various written decisions. App. 237 (Naca's own written timeline of events identifying the date of the meeting as "Tuesday May 6, 2014"); App. 180 (describing May 6 meeting under "Areas of Agreement"); App. 185 (Naca letter to Murray with repeated references to the May 6 meeting); App. 64 (204) (Naca's testimony that the letter was truthful and had been reviewed by counsel).

Pointing to vague, scattered references in the record regarding the timing of this meeting, Naca now contends that it actually occurred on May 7 and thus (according to Naca) *after* she submitted Doe's final grade (as discussed below). Even if Naca is now
(continued...)

going to grade papers.  App. 714.  Instead, Naca initiated a conversation about what she

perceived to be sexual tension between them.  App. 231.  Naca later recounted that she

said the following to Doe:

> I need to talk to you about the intensity level of us working
> together.  It could just be the subject matter of your poems.
> But the last two sessions our conferences I sensed, though
> you probably don't know it, that you were flirting with me.
> There is an attraction between the two of us be it physical or
> just creative.  Either way—I wanted to have a conversation
> because I don't want us to be working together and for me,
> or you, to be put in an awkward position.
>
> I'm going to be frank.  I need to know, first, if you noticed
> the intensity?  And if you do, do you want me to make a
> pass at you?  If you don't want or intend that, we need to get
> whatever it is out in the open and clear the air.

App. 237.  According to Doe, during the course of their conversation, Naca touched her

knee and later put her arm around her waist.  App. 714; App. 180, 182.  Doe, who

described herself as shocked by Naca's comments, rebuffed Naca's advances.  App. 237;

App. 714.  After this encounter, Doe continued to work as Naca's assistant for about

another week.  App. 193; App. 263.

---

[14](...continued)
correct about the date of the meeting, however, it is clear *Macalester* believed, at the time
that it made the decision to terminate Naca, that the meeting occurred on May 6.  Again,
the only two participants in the meeting consistently told Macalester that their meeting
occurred on May 6.  Without any suggestion from Naca or anyone else that the May 6
date was incorrect, Macalester had no reason to scour the materials for the purpose of
second-guessing the date of the meeting, and there is no indication that Macalester did
so.

Doe graduated on May 17, 2014.  App. 299 (80).  Three days later, on May 20, Naca invited Doe to her home, and the two began a sexual relationship.  App. 193; App. 238-39; App. 714.  Although the physical aspect of their relationship ended after several weeks, the two continued in an emotionally intimate relationship until September 2014, when Naca ended it.  App. 180-81.  Doe later sank into a depression and began seeing a counselor.  App. 714.

## C. Doe's Complaint and Macalester's Investigation

On May 22, 2015, Doe met with James Hoppe, the dean of students at Macalester, to make a complaint against Naca.  App. 366 (53-54); App. 404.  In addition to being the dean of students, Hoppe was the deputy Title IX coordinator and thus was responsible for receiving complaints of sexual assault.  App. 366 (53-54).  Doe told Hoppe that she had felt pressured into having a sexual relationship with Naca the previous year and that the relationship had a negative impact on her.  App. 369 (68).  Hoppe told Doe about her options for pursuing a formal complaint.  App. 712 ¶ 6.  On May 27, 2015, Doe submitted a written complaint to Hoppe.  App. 371 (75-76); App. 716.

Hoppe notified Naca of Doe's complaint on May 29 and gave her a packet of information that included Macalester's policies on harassment and sexual assault. App. 62 (196-98); App. 153-76 (Naca Dep. Ex. 29); App. 178; ECF No. 226 at 60.  Hoppe

informed Naca that she was entitled to have a "support person" to help her through the investigative process, but that she could not have an "advisor." App. 63 (199-200).

In the meantime, Hoppe notified Murray (the provost) of Doe's complaint, and Hoppe turned the investigation over to the Macalester College Harassment Committee ("MCHC"). App. 371; App. 374 (76, 88). The MCHC consisted of Lisa Landreman, Chad Higdon-Topaz, and Roopali Phadke. App. 374 (88). Both Naca and Doe had an opportunity to submit materials to the MCHC. App. 63 (201-02); App. 477 (127). The MCHC interviewed both Naca and Doe and reviewed records and other written materials. App. 63 (201-02); App. 477-78 (127-28, 131); App. 668 (150).

Among other things, the MCHC obtained documentation showing that Naca had submitted her spring 2014 grades on May 15 of that year. App. 182; App. 262; App. 486 (161-62). As it turned out, however, this date was incorrect; Murray learned on June 17, 2015, shortly after the MCHC issued its report, that Naca had submitted her grades for Doe's class on May 7.[15] App. 429 (142-44). Murray evidently did not put this information in the investigative file or otherwise seek to correct the record. App. 429

---

[15]In her brief, Naca asserts that Doe admitted in her "Answer and Counterclaim" that she heard Naca announce the grades in class. ECF No. 231 at 14 n.91. This is evidently a reference to the answer that the Does filed in Naca's state-court action against Doe and her parents. As far as the Court can tell, however, that document is not in this Court's record. In any event, Doe told the MCHC that she did not know her grade before the May 6 meeting at which Naca solicited her. App. 182; App. 716.

(144); App. 486 (162).  As discussed above, however, this corrected date still indicated

that Naca submitted Doe's final grade after their May 6 meeting.

After completing its investigation, the MCHC issued a report in which it laid out

the results of its investigation and recommended that the matter proceed to a formal

adjudication.[16]  App. 294 (51); App. 180-83.  Under Macalester's policies, when formal

proceedings involving accusations of harassment or sexual assault are instituted against

a faculty member, the provost serves as the "relevant authority."  App. 163; App. 174.

Both the complainant and the respondent have the opportunity to submit additional

materials for the provost's consideration.  App. 479 (133-35).  If the provost

recommends a "severe sanction" against the faculty member, the Faculty Personnel

Committee ("FPC") must conduct a hearing.  App. 164; App. 175.  The FPC consists of

the president, the provost, and six faculty members elected by the faculty.  App. 517 (12-

13).

After reviewing the MCHC file, Murray determined that the sanction could be

severe and contacted the chair of the FPC to arrange for the committee's members to

have access to the investigative file.  App. 333.  Shortly afterward, however, the chair

realized that the FPC's involvement was premature and instructed that the members'

---

[16]The report is dated June 8, 2015, but other documents in the record indicate that
its contents were still under discussion a day later.  *See, e.g.*, ECF No. 226 at 65-66.  Naca
testified that she reviewed it in the latter half of June 2015.  App. 63-64 (202-03); *see* ECF
No. 226 at 152-53.

access to the investigative file be terminated until the provost issued her formal recommendation. App. 538-39 (116-19); App. 66 (213). There was some discussion about convening the FPC before the end of June, but that did not happen. App. 301 (87-88); App. 532 (86). Murray, who was leaving Macalester effective July 1 to take a position at another college, agreed to make a formal recommendation before handing the case off to her successor. ECF No. 226 at 152. As it turned out, however, Murray did not have time to do so before leaving Macalester, App. 437-38, although she did discuss the case with her successor, App. 297 (67-68).

On June 21, Hoppe emailed Naca to notify her of the next steps in the process and to make arrangements for her to review the MCHC investigative file. App. 440. Hoppe also stated that the original letter notifying Naca about Doe's complaint mistakenly omitted that Naca was accused of violating Macalester's sexual-assault policy as well as the harassment policy. App. 440. Naca responded that this and other errors had hindered her ability to convey her side of the story and that she would be meeting with an attorney. App. 441. Hoppe told Naca that she could submit any additional information that she thought was necessary to the provost for her consideration. App. 442. Naca drafted a letter that she submitted to Murray after it was reviewed by her attorney. App. 64 (204); App. 185-86.

As noted, Murray's last day as provost was June 30. App. 721 ¶ 2. Accordingly, the new provost, Karine Moe, took over the Naca matter. App. 191. Moe reviewed the materials submitted to the MCHC as well as additional materials that Naca submitted. App. 190; *see also* App. 682 (Moe's description of her review process). On July 23, 2015, Moe issued a written case determination finding that Naca had violated Macalester's sexual-assault and harassment policies and recommending termination. App. 190; App. 197-98. On July 27, Moe placed Naca on a paid leave of absence pending the final resolution of the process. App. 188.

In her determination, Moe made several factual findings. Specifically, Moe found that, by inviting Doe to her home on May 6, Naca "intended to set the stage for a sexual relationship" and "initiated that relationship by offering to make a pass at the student." App. 196. Moe explained that, if Naca had truly intended to clear the air rather than invite a sexual relationship, she should have conducted the discussion in an office or public place. App. 196. Moe also credited Doe's allegation that Naca touched her on her knee and waist during the May 6 meeting and noted that Naca had attempted to keep the relationship secret and asked Doe to seek only off-campus counseling. App. 196-97 & n.4; App. 680-81. Moe noted the parties' dispute over who initiated their first sexual encounter, but did not resolve it; instead, she explained that,

regardless of who initiated the encounter, Naca "created the stage where such contact could occur . . . ."  App. 193.

Moe went on to say that she was "deeply troubled" by Naca's view that she had not violated any of Macalester's policies because Doe was no longer a student at the time of their first sexual encounter.  App. 197; *see also* App. 235 (Naca's timeline stating that she "took care to follow the College's sexual conduct code" and that Doe "had graduated before physical contact took place").  Moe stated:

> As Provost and Dean of the Faculty, I strongly disagree with Professor Naca's views of the limits of her role and responsibility as mentor and professor, particularly with respect to a student with whom she worked so closely over the preceding three years, who so plainly continued to view Professor Naca as a mentor, and who had graduated only days earlier and for whom continued professional support, advice and recommendations were expected as a result of the strong and close faculty-student relationship.

App. 197.

Because Moe recommended termination, the matter was submitted to the FPC for a hearing.  App. 678.  Naca's lawyer helped her to prepare for that hearing, and Naca again had the opportunity to submit additional materials (which she did).  App. 65 (207-10); App. 265-66; App. 268-70; App. 686.

The FPC held a hearing on August 24, 2015.  App. 272.  At that time, the FPC consisted of the president of Macalester (Brian Rosenberg) and faculty members Joan

Ostrove, Chris Wells, Sarah Boyer, Dan Trudeau, Tom Halverson, and Patrick Schmidt. App. 66 (213); App. 678. While Moe, as provost, was also a member, it appears that her role was limited to presenting and defending her recommendation. App. 682. Naca appeared at the hearing and answered questions. App. 678-81, 85-86. Naca was allowed to have two support people present. App. 66 (211). She was also permitted to have her lawyer at the hearing, but she decided against it, opting instead to submit a letter from him. App. 66 (211); App. 268-70.

Following the hearing, the FPC issued a written decision finding that Moe's decision was "amply supported by the record" and endorsing the recommended sanction of termination. App. 272-73. The FPC noted that, even under Naca's narrow view of the student-professor relationship, the discussion on May 6 violated college policy, as it occurred before Naca submitted final grades and while Doe was still under Naca's supervision as a student worker. App. 272. The FPC went on to say that, "[b]eyond this, we are in agreement with the [provost's] determination that the 'professor/student relationship' does not end immediately upon graduation." App. 272-73. The FPC specifically criticized Naca for failing to understand "the implications of the power relationship or of her role in attending to the potential consequences of power dynamics in such relationships with students." App. 272-73.

After receiving notice of the FPC's determination, Naca (with the assistance of counsel) submitted a letter of appeal.  App. 66 (213-14); App. 275-78.  On September 28, 2015, the appeals team—which consisted of Denise Ward and Rebecca Hoye—rejected Naca's appeal, bringing the process to a close.  App. 66 (213-14); App. 280-81; App. 67 (215-16).

### D.  Naca's State Court Lawsuit

After her discharge, Naca sued Jane Doe and her parents in state court, claiming defamation, tortious interference with contract, and tortious interference with prospective contractual relationships.  App. 15 (10); Nickitas Decl. Ex. 2 at 1.  The Doe family counterclaimed, alleging abuse of process, reprisal under Title IX and the Minnesota Human Rights Act, and publication of private facts.  *Id.*  The parties settled the lawsuit, expressly agreeing that there was no admission of liability on either side.  *Id.*  As part of the consideration for the settlement agreement, Doe was forced to write a letter to Naca complimenting Naca's teaching and stating that she never alleged sexual assault.  *Id.* at 2-3.  Similarly, Doe's parents were required to write a letter stating that they did not intend for Naca to lose her job.  *Id.* at 2.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

### B.  Discrimination

Naca brings claims of discriminatory discharge on the basis of (1) sex under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.; (2) race/ancestry under 42 U.S.C. § 1981; (3) sex, race/ancestry, and religion under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; and (4) sex, race/ancestry, religion, and sexual orientation under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 et seq.

Naca has no direct evidence of discrimination on any of these bases. *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) ("direct evidence is evidence

showing a specific link between the alleged discriminatory animus and the challenged decision" (cleaned up)); *Floyd-Gimon v. Univ. of Ark. for Med. Sci. ex rel. Bd. of Trs.*, 716 F.3d 1141, 1149 (8th Cir. 2013) ("Direct evidence does not include stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." (cleaned up)). Accordingly, the Court analyzes Naca's discrimination claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brine v. Univ. of Iowa*, 90 F.3d 271, 276 (8th Cir. 1996) (Title VII standards apply to employment-discrimination claims under Title IX); *Chappell v. Bilco Co.*, 675 F.3d 1110, 1118 (8th Cir. 2012) (*McDonnell Douglas* framework governs claims of race discrimination under § 1981); *LaPoint v. Family Orthodontics, P.A.*, 892 N.W.2d 506, 510-11 (Minn. 2017) (*McDonnell Douglas* framework governs claims under the MHRA).

To establish a prima facie case of discrimination, a plaintiff must show that (1) she is a member of a protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances permit an inference of discrimination. *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016). If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision. *Id.* If the employer

meets this burden, then the plaintiff must prove that the proffered reason is merely a

pretext for discrimination. *Id.*

The Court does not believe that Naca has established a prima facie case of

discrimination. Nothing about the circumstances of this case gives rise to an inference

of discrimination. In May 2015, when Doe made her complaint, Macalester was

beginning the process of approving Naca for tenure. Up to that point, Naca's career

was progressing smoothly. What changed after May 2015 was not Doe's race/ancestry,

sex, sexual orientation, or religion; what changed is that a former student made a formal

complaint of sexual misconduct.

Macalester carefully investigated Doe's complaint and found that it was

generally true. Naca admitted that she invited Doe to her home shortly before

graduation, that she offered to "make a pass" at Doe, and that, a few days after

graduation, she again invited Doe to her home, where the two commenced a short-lived

sexual relationship. This was extremely serious misconduct—and there is nothing at all

suspicious about a college terminating a professor for committing such misconduct. As

this Court explained in an earlier order:

> Sexual contact between a professor and a student is widely
> prohibited because of disparities in their relationship. There
> is always a disparity in power and authority, and often
> disparities in education, experience, sophistication, or age.
> As a result of these disparities, a student cannot give
> authentic consent to sex with [a] professor. In continually

> emphasizing that she did not have sex with the student until
> three days after the student graduated, Naca ignores that the
> student testified (and Macalester found) that Naca solicited
> sex from the student *while she was still a student*. Naca also
> ignores that Macalester could reasonably have concluded
> that the disparities between a professor and a student do not
> entirely disappear the instant that the student is handed her
> diploma.

*Naca v. Macalester Coll.*, No. 16-CV-3263 (PJS/BRT), 2017 WL 4122601, at *4 (D. Minn.

Sept. 18, 2017). Under these circumstances, the Court cannot find that Naca's discharge

permits an inference of discrimination.

Even assuming that Naca has made out a prima facie case, however, Macalester

has clearly articulated a legitimate, non-discriminatory reason for discharging

Naca—namely, Naca's sexual relationship with Doe. The ultimate question, then, is

whether Naca has offered sufficient evidence from which a factfinder could conclude

that this explanation is a pretext for discrimination.

Naca contends that Macalester did not terminate straight white male Christian

professors who engaged in similar misconduct; that the proceedings were infected by

procedural irregularities and intentional misconduct on Macalester's part; and that

Macalester's explanation for its decision has changed over time. *See Edwards v. Hiland*

*Roberts Dairy, Co.*, 860 F.3d 1121, 1125-26 (8th Cir. 2017) ("A plaintiff may show pretext,

among other ways, by showing that an employer (1) failed to follow its own policies,

(2) treated similarly-situated employees in a disparate manner, or (3) shifted its

explanation of the employment decision." (cleaned up)).  The Court considers each of these contentions in turn.

## 1.  Comparators

Naca alleges that two Macalester professors—Terry Boychuk and Stanton Sears—engaged in similar misconduct but were not terminated.  Naca's allegations are false, however, and neither of these professors is similarly situated to her.

With respect to Boychuk:  In the early 2000s, before Boychuk was granted tenure, a number of students complained to Macalester about him.  In 2001, a Macalester student reported that he was uncomfortable with the way that Boychuk had discussed the topic of sexual violence in class.  App. 726 ¶ 4.  In late 2001 or 2002, several students reported that they had heard rumors that Boychuk had sexually harassed other students, but were unable to provide the names of any potential victims.  App. 727 ¶ 6.  And in 2002, after Macalester announced that Boychuk was up for tenure, five students (including the students who had earlier reported rumors of harassment) wrote a letter raising concerns about Boychuk sexually harassing students.[17]  App. 727 ¶ 7.  None of the authors had personally experienced or witnessed harassment—nor were any of the

---

[17]In Moe's Fed. R. Civ. P. 30(b)(6) deposition, she made a reference to five students sending a letter about Boychuk "in early March of 2015 . . . ."  App. 611 (103).  From the ensuing testimony, however, it is clear that Moe was talking about events that occurred in 2002 and simply misspoke.  Neither party contends—and the Court is not aware of anything in the record indicating—that there was a complaint against Boychuk in 2015.

authors able to identify any student who had personally experienced or witnessed harassment—but the authors suggested that the student who had earlier complained about the classroom discussion might be a victim. App. 728 ¶¶ 8-9.

Subsequently, another student, Hlee Vang, reported that Boychuk made inappropriate comments about underwear. App. 728 ¶ 10. Specifically, Vang had delivered a package to Boychuk's office and asked him what it was. App. 583 (31-32). Boychuk replied that it was underwear, talked about his fabric and color preferences for underwear, and asked Vang what color underwear she wore. App. 583 (32). Vang was uncomfortable and left his office. App. 583-84 (32-33). Vang also reported that, during class, Boychuk had mocked some Jamaican and Hmong students who had expressed fear of paranormal activity. App. 584 (33-35). Macalester imposed some mild sanctions on Boychuk and granted him tenure shortly afterward. App. 609-10 (96-101).

Boychuk's case provides no evidence that Naca was the victim of discrimination. To begin with, none of the people involved in making the decision to grant tenure to Boychuk were later involved in the decision to terminate Naca. The two decisions were made by entirely different sets of decisionmakers, and thus any inconsistency in the decisions would not be evidence that any particular decisionmaker was motivated by race, sex, or any other protected characteristic. *See Muor v. U.S. Bank Nat'l Ass'n*, 716 F.3d 1072, 1078 (8th Cir. 2013) ("the employees used for comparison must have dealt

with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances" (cleaned up)). Naca argues that David Deno, a member of Macalester's board of trustees, was on the board both when she was terminated and when Boychuk received tenure. But there is no evidence that Deno had anything to do with Naca's termination.

Setting that aside, the conduct of which Boychuk was accused was worlds apart from the conduct to which Naca admitted. The students who complained of sexual harassment did not have firsthand knowledge of any such harassment and were unable to identify anyone who did. There is no evidence that anyone ever reported—or that Macalester ever learned—that Boychuk had offered to make a pass at a student or had sexual contact with an alumna shortly after graduation.[18] The only specific conduct of which Boychuk was accused—an uncomfortable classroom discussion, comments about underwear, and mocking students for believing in the paranormal—while not exemplary, is far less serious than the sexual misconduct in which Naca admittedly engaged. *See Burton v. Ark. Sec. of State*, 737 F.3d 1219, 1230-31 (8th Cir. 2013) (to be similarly situated, comparators must have engaged in misconduct of comparable seriousness). Simply put, the decision of one group of decisionmakers to treat Boychuk

---

[18]Vang testified that she had heard that Boychuk had propositioned students and perhaps had some sexual relationships, but she does not claim that she or anyone else reported any such conduct to Macalester. App. 581-82 (23-27).

favorably—thirteen years before Naca was terminated by a different group of decisionmakers after admitting to much more serious misconduct—does nothing to show that Macalester's stated basis for Naca's termination is pretextual.

With respect to Stanton Sears:  Sears married a Macalester alumna sometime in the late 1990s.  App. 614 (124-25).  Sears met his future wife in 1992, when she was still a student.  App. 614 (125), App. 616 (131-32).  There is no evidence that Sears solicited sex from his future wife while she was still a student, and no evidence that Sears and his future wife began a sexual relationship days after she graduated.  According to the only evidence in the record on this issue, Sears and his future wife began dating at some unknown time after her graduation and married six or seven years after they first met.  App. 616 (131-32).  Moreover, there is no evidence that Macalester was even aware that Sears had married a former student, much less that Macalester was informed that Sears had engaged in sexual misconduct with his future wife while she was a student or recent alumna.  App. 614 (124).  Obviously, the fact that Macalester never took action against Sears is not evidence of pretext.

Naca attempts to solve this problem by recklessly accusing Sears and his future wife of starting a sexual relationship while she was still a student.  Naca's "evidence" for this consists of various websites—some of which the Court cannot access—in which Sears or his wife states that the two have "collaborated" since 1993 and that she

graduated in 1995.  ECF No. 231 at 38 n.121.  According to these websites, both Sears

and his wife are sculptors and public artists, and they run an art studio together.  Naca

argues that when Sears and his wife tell the world that they have "collaborated" since

1993, they do not mean "collaborated on art," but instead mean "had sex with each

other."  Naca's argument is ridiculous.

Again, there is not a shred of evidence that Sears engaged in sexual misconduct

of any kind; not a shred of evidence that Macalester was aware of any sexual

misconduct by Sears; and not a shred of evidence that any of the decisionmakers in

Naca's case were even employed by Macalester back in 1993.  Sears's case, like

Boychuk's, provides zero evidence of pretext.

## 2.  Procedural Irregularities

Naca also attempts to show pretext by complaining about various procedural

problems with Macalester's investigation of Doe's complaint.  She complains, for

example, that she was not initially told that she was accused of sexual assault (in

addition to harassment); that she was not told that Doe's parents had written a letter

that was made part of the investigative file; that Macalester tried to schedule the FPC

meeting before the provost issued her case determination; and that Macalester falsely

claimed that Naca turned in the grades for her capstone class on May 15 and buried

evidence that she actually turned them in before the meeting at which she offered to make a pass at Doe.

This is much ado about nothing. Naca learned that she was accused not only of sexual harassment but also of sexual assault less than a month after Doe made her complaint and well before Moe issued her case determination; Naca was then permitted to supplement the record, which she did with the help of her attorney. The letter from Doe's parents simply mirrors the allegations that Doe made against Naca; the letter does not contain any material information that was not already known to Naca. The FPC hearing did not, in fact, take place until after Moe issued her case determination. And Macalester's failure to disclose evidence that Naca submitted her grades on May 7 is of little significance because, as discussed above, May 7 was still after the date on which Naca offered to make a pass at Doe. Moreover, as both Moe and the FPC made clear, ultimately *it did not matter* to them whether Naca submitted her grades before or after she made a sexual advance to Doe.[19]

While Naca focuses on these inconsequential errors, she fails to acknowledge the big picture: Naca had multiple opportunities to present her side of the story (in writing

---

[19]Although both Moe and the FPC mentioned the timing of Naca's submission of grades, both also took pains to emphasize that the prohibition on professors having sex with students continues to apply for at least some time after graduation (which, of course, is after submission of grades). Both also criticized Naca for failing to appreciate that the imbalance in power between a professor and a student does not simply disappear on graduation day.

and in person), add evidence to the record, and consult with an attorney. She had her case go through five layers of review: (1) by Hoppe, (2) by the MCHC, (3) by the provost, (4) by the FPC, and finally (5) by the appeals team. And at least *14* decisionmakers were involved in one way or another in reviewing Naca's case, including Hoppe, Landreman, Higdon-Topaz, Phadke, Moe, Rosenberg, Ostrove, Wells, Boyer, Trudeau, Halverson, Schmidt, Ward, and Hoye—and not one of them, as far as the record discloses, had any bias against Naca. No reasonable juror could conclude that Macalester was somehow trying to railroad Naca.

More fundamentally, even if a jury could find that Macalester was trying to manipulate the process to ensure that Naca would be terminated, nothing in the record would support the further finding that the *reason* Macalester wanted to terminate Naca was because of her race, sex, or another protected trait. Again, all evidence in the record shows that, before Doe made her complaint, Naca was doing well and on track to gain tenure. Even if Naca could prove that, after receiving Doe's complaint of sexual misconduct, Macalester rushed to judgment or treated Naca unfairly, Naca could still not recover because she could still not prove that the *reason* that Macalester rushed to judgment or treated her unfairly was because she was Puerto Rican or female (or a member of some other protected group).

Consider, for example, Naca's complaint about the letter from Doe's parents. Naca seems to believe that its inclusion in the investigative file put pressure on Macalester to terminate her—possibly to avoid a lawsuit by Doe's parents—and that Macalester's failure to disclose the letter is proof of this nefarious intent. What Naca loses sight of, however, is that even if that is true, it is not evidence of discrimination. To the contrary, it is evidence that Macalester did *not* fire Naca because of her race or sex or another protected characteristic. *Cf. Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-86 (8th Cir. 2002) ("Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices."). In addition, even if Macalester failed to follow its own procedures—and even if Naca is correct that her relationship with Doe did not violate any Macalester policy—that is not enough to show pretext when Naca cannot point to a single similarly situated comparator who was treated differently. *See Smith v. Allen Health Sys.*, 302 F.3d 827, 835 (8th Cir. 2002) ("since Smith has pointed to no other employees who were treated differently under the progressive discipline policy, Allen's failure to give written warning does not tend to prove that the reason given for her firing was pretextual").

Naca cites a number of Title IX cases for the proposition that procedural irregularities and the desire to avoid litigation are, in fact, evidence of sex bias. But all

of these cases involve male plaintiffs who were disciplined after being accused of sexual misconduct by women.[20]  *See, e.g., Doe v. Columbia Univ.*, 831 F.3d 46, 49 (2d Cir. 2016); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 712 (2d Cir. 1994).  In determining whether the plaintiffs' allegations were sufficient to state a claim, the courts treated allegations of procedural irregularities and fear of litigation as indicating that the schools were under general pressure to discipline *male* students.  *See Doe*, 831 F.3d at 56-58 (allegations of procedural irregularities and pressure on school to take female students' complaints more seriously were sufficient to allege a pro-female, anti-male bias); *Yusuf*, 35 F.3d at 715-16 (allegations of procedural unfairness and a history of always finding accused males guilty was sufficient to state a Title IX claim).

In other words, the logic of these cases is that evidence that a school had a motive to uphold accusations made by *females* against *males* is evidence that the school is biased against men.  Whatever the logic of that reasoning, it has nothing to do with this case, which involves a *female* making an accusation against another *female*.  Under the circumstances, evidence that Macalester showed favoritism to one or the other would

_____

[20]Naca cites one case involving alleged male-on-male sexual misconduct.  *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016).  *Brandeis* did not, however, involve Title IX or other discrimination claims.  *See id.* at 593 n.19.  Instead, it involved only claims under Massachusetts state law, which, among other things, imposes a contractual "fairness" requirement on university disciplinary proceedings against a student.  *Id.* at 594.  As discussed below, Naca cites no authority for the existence of such a duty in the employment context.

not be evidence of bias for or against women.  *Cf. Yusuf*, 35 F.3d at 716 (male plaintiff could not state a selective-enforcement claim under Title IX in part because his comparator was also male).

Moreover, as these cases make clear, procedural infirmities alone are insufficient; there must be some evidence of sex-based bias.  *Yusuf*, 35 F.3d at 715 ("allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss").  Finally, these cases involved allegations of significant procedural irregularities that, if true, would cast considerable doubt on the accuracy of the school's factual conclusions.  Here, by contrast, the procedural violations are trifling and do not in any way cast doubt on the central facts—that Naca offered to make a pass at Doe shortly before she graduated, and then had sex with Doe shortly after she graduated.  Those facts have never been in doubt.

To the extent that Naca may be seeking to expand this reasoning from Title IX to her other discrimination claims, her attempt fails because she has no evidence that any of the decisionmakers harbored racial, religious, or any other bias.  True, Naca contends that Murray threatened her employment after Naca disclosed that she would be undergoing training to become a Santeria priestess.  The Court does not view the record as reasonably supporting an inference of religious bias on Murray's part, however.  Any

responsible provost would likely express concern to an untenured faculty member who, shortly after complaining that she was suffering from "debilitating fatigue" and shortly before going up for tenure, announced that she had decided to train to become a Santeria priestess and that, as a result of that training, her "life, or roles, in public will be significantly diminished or limited." App. 128.

Even if the record would support such an inference, Murray ultimately did not play a substantive role in making the decision to terminate Naca. Instead, Murray's role was limited to certain procedural matters, such as opining that the matter warranted the involvement of the FPC. The formal recommendation to terminate Naca was made by Moe in a written decision that reflects that Moe reviewed the record and came to her own conclusions. Moe's recommendation was then adopted by the FPC and upheld by the appeals team. There is no evidence that Moe, any member of the FPC, or any member of the appeals team harbored religious bias (or any other kind of bias).[21]

### 3. Shifting Explanations

Finally, Naca contends that Macalester has offered shifting explanations for her termination, pointing to the belated sexual-assault charge as an example. This contention is meritless. Macalester has consistently cited Naca's sexual misconduct with Doe as the reason for Naca's termination; Macalester has never claimed that Naca

---

[21]Although Naca does not have a claim for discriminatory discharge on the basis of disability, the Court notes that, for the same reason, any such claim would fail.

was fired for any other reason. The fact that Macalester first labeled Naca's alleged

conduct as sexual harassment—and then labeled the same conduct as sexual

assault—does not establish pretext. Every decisionmaker has been clear and consistent

that Naca should be terminated for the misconduct in which she engaged with Doe,

irrespective of what label is attached to that misconduct. *See Wierman v. Casey's Gen.*

*Stores*, 638 F.3d 984, 995 (8th Cir. 2011) ("pointing out additional aspects of the same

behavior is not probative of pretext").

Because there is no evidence from which a reasonable jury could conclude that

Macalester's legitimate, non-discriminatory reason for firing Naca is pretextual, the

Court grants Macalester's motion for summary judgment on her discrimination claims.

## C. Failure to Accommodate

Naca also brings a claim of failure to accommodate under § 504 of the

Rehabilitation Act, 29 U.S.C. § 794. To establish a prima facie case under § 504, Naca

must establish that (1) she was disabled; (2) she was qualified to perform the essential

functions of her job with or without reasonable accommodation; and (3) she suffered an

adverse employment action due to her disability. *Dick v. Dickinson State Univ.*, 826 F.3d

1054, 1060 (8th Cir. 2016). Failing to reasonably accommodate an employee's disability

qualifies as an adverse employment action due to disability. *Id.* at 159-60. But an

employer is not required to provide the specific accommodation requested or preferred by the employee. *Scruggs v. Pulaski Cty.*, 817 F.3d 1087, 1093 (8th Cir. 2016).

Naca's § 504 claim fails because no reasonable jury could find that Macalester failed to reasonably accommodate her disability. There is no dispute that Macalester provided a number of accommodations to Naca—including student assistance, a lighter laptop, and classes scheduled in only one building. And there is no dispute that, with these accommodations, Naca was able to perform the essential functions of her job. Indeed, *Naca herself* has said that she performed the essential functions of her job, ECF No. 231 at 25, and she testified at her deposition that she was able to teach, research, engage in scholarship, and serve on committees, App. 82-83 (277-79). In light of this evidence, Naca's accommodation claim fails as a matter of law. *See Burchett v. Target Corp.*, 340 F.3d 510, 518 (8th Cir. 2003) (affirming summary judgment where plaintiff admitted that she could perform the functions of her position with the accommodations provided).

Naca contends that Macalester did not go far enough because it did not grant all of her requested accommodations for medical leave and student assistance. As noted, Naca has an expansive definition of "medical leave," and thus it is difficult to determine from the record what she meant on any occasion on which she requested medical leave. But even if Naca requested an entire semester of fulltime medical leave from someone

empowered to grant it to her, she never provided Macalester with any medical documentation to support such a request. Not once did any doctor or other healthcare professional tell Macalester that Naca needed fulltime medical leave. Instead, the forms that Naca submitted from her doctor consistently requested office assistance and intermittent time off. *See Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 482 (5th Cir. 2016) (employers may require medical documentation to support the need for accommodation); App. 339 (Macalester policy requiring medical certification for medical leave of three or more days).

Similarly, the fact that Macalester did not formally arrange for Naca to have intermittent time off does not mean that Macalester failed to accommodate Naca's disability. The record demonstrates that Naca's schedule was sufficiently flexible that there was no need for Macalester to make formal arrangements; indeed, since the intermittent time off was to be on an as-needed basis, it is unclear how Macalester *could* have made formal arrangements in advance (since it could not know in advance when Naca would need intermittent leave). Moreover, there is no evidence that Naca ever requested a particular morning, afternoon, or entire day off, much less that Macalester denied such a request.

With respect to the amount of office assistance: Again, Naca has not shown—and does not even contend—that she was unable to do her job with the amount

of office assistance that she was provided.[22]  Naca has also not pointed to any medical

evidence that the failure to provide her desired accommodations had a detrimental

effect on her health.  Naca's entire claim seems to rest on the mistaken premise that,

because she was disabled, she had the right to the precise accommodations that she

requested.  That is plainly not the law.

Naca also contends that she was eligible for leave under the FMLA and that

Macalester concealed this from her.  Even assuming that such conduct would be

actionable under the Rehabilitation Act, no reasonable jury could find that Naca was

eligible to take FMLA leave.  *See Lovland v. Emp'rs Mut. Cas. Co.*, 674 F.3d 806, 811 (8th

Cir. 2012) (a claim of interference under FMLA requires employee to prove that the

employer denied a benefit to which she was entitled under the FMLA).

An employee is entitled to FMLA leave if she has a serious health condition "that

makes the employee unable to perform the functions of the position of such employee."

29 U.S.C. § 2612(a)(1)(D).  As already discussed, the record is clear—and Naca herself

concedes—that she *was* able to perform the functions of her position.  Moreover, Naca

never provided Macalester with any medical evidence that she was in need of fulltime

---

[22]As noted earlier, Naca cites no evidence to support her claim that she had to
pay for her own research assistance.

leave.[23]  *See* 29 U.S.C. § 2613(a) (employers may require medical certification for FMLA leave); App. 339 (Macalester policy requiring medical certification).

Naca points to the fact that Graf wrote "FMLA designation—yes" in a note to himself after his telephone call with Naca's doctor.  But Graf explained that his note merely meant that *if* Naca ever required a medical leave, that leave should be designated as FMLA leave.  Crucially, the telephone call to which Graf's note related occurred after Naca's doctor submitted a form that identified the accommodations that Naca would need, and that form did not identify fulltime leave as one of them.  There is no evidence that any doctor or any other medical provider ever told Graf or anyone else at Macalester that Naca needed fulltime leave.  Under these circumstances, no reasonable jury could find that Graf concluded that Naca was entitled to take FMLA leave but decided to conceal this fact from her.[24]

It is true that Naca's request for a reduced class schedule for the fall of 2014 was not granted.  The record does not indicate why that happened, but assuming that

_____

[23]To the extent that Naca's FMLA argument relates to her requests for intermittent leave, the Court again observes that Naca had an extremely flexible schedule and that there is no evidence that she asked for any particular morning, afternoon, or day off, much less that such a request was denied.

[24]Likewise, given that Naca's doctor never submitted a request for fulltime leave, the fact that Murray testified that she knew that Naca was "eligible" for FMLA leave, *see* App. 316 (151), cannot be construed as an admission that Murray knew that Naca *needed*—and, as a result, was *entitled* to—fulltime leave under the FMLA.

Naca's request was denied (rather than withdrawn), again, Naca cannot show that she needed a course reduction to perform her job. Nor did she supply any medical documentation to support her request for a course reduction; to the contrary, Naca's doctor informed Macalester during the fall 2014 semester that Naca's prognosis was excellent, that she expected "near complete recovery" by November 2015, and that until then Naca "may continue to need an administrative assistant and occasional time off in the afternoon to rest and recover." App. 144. The doctor said nothing about Naca needing—or being harmed by the lack of—a course reduction.

Naca also claims that Macalester failed to grant her request for a course reduction for the fall 2015 semester and denied her request for a research assistant in May 2015. But Naca's own testimony indicates that her request for a fall 2015 course reduction would have been approved had she not been fired. App. 61 (192). And as for her request for a research assistant, the fact that she was not allowed to use work-study funds to employ the particular assistant whom she wanted (because that assistant had graduated and therefore was no longer eligible for work study) does not establish a violation of the Rehabilitation Act. In any event, any need for these accommodations became moot when Naca was put on leave and then terminated shortly after making these requests.

Finally, Naca claims that there is a genuine dispute as to whether Macalester engaged in the interactive process in good faith to determine if she could be reasonably accommodated.

> To establish that an employer failed to participate in an interactive process, a disabled employee must show: (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Cravens v. Blue Cross & Blue Shield*, 214 F.3d 1011, 1021 (8th Cir. 2000). There is no per se liability for failing to engage in the interactive process; instead, such failure may be relevant to show that there is a factual question as to whether the employee could be reasonably accommodated. *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999).

No reasonable jury could find that Macalester failed to engage in the interactive process. The record is replete with evidence of back-and-forth communications between Naca and Macalester regarding her various needs for accommodation. Graf himself granted the accommodations that Naca's doctor requested. After Naca complained about Graf, Murray agreed that Naca could talk to Murray instead of Graf. And Macalester provided accommodations that were generally in line with what Naca's doctor requested.

Even if a jury could find that Macalester failed to engage in the interactive process, Naca could not avoid summary judgment. Under *Cravens*, Naca must show that, but for Macalester's bad faith, she could have been reasonably accommodated. As discussed above, however, Naca *was* reasonably accommodated, and thus she cannot make this showing. *See Kallail v. Alliant Energy Corp. Servs.*, 691 F.3d 925, 933 (8th Cir. 2012) (plaintiff's interactive-process argument failed because the employer offered her a reasonable accommodation).

For these reasons, Macalester's motion for summary judgment on Naca's Rehabilitation Act claim is granted.

## D.  Breach of Contract

Finally, Naca alleges that, by failing to promptly notify her of the sexual-assault charge, Macalester deprived her of important procedural rights to which a faculty member accused of sexual *harassment* is not entitled, but to which a faculty member accused of sexual *assault* is entitled—namely, the right to remain silent and the right to be represented by an attorney.

Under Minnesota law, an employee handbook may create an enforceable contract. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn. 1983). But "[l]anguage in the handbook itself may reserve discretion to the employer in certain

matters . . . ." *Id.* That is what the sexual-assault policy did in this case. It stated, in

relevant part:

> The procedures described in this policy are intended as
> guidelines describing how harassment complaints will
> typically be handled. The College reserves the right to vary
> from these procedures based upon its evaluation of the
> circumstances of each matter.

App. 176. Because this language prevented the formation of a contract, Naca's breach-

of-contract claim must be dismissed. *See Simonson v. Meader Distrib. Co.*, 413 N.W.2d

146, 147-48 (Minn. Ct. App. 1987) (affirming summary judgment where employer

"expressly reserved the discretion to deviate from the policy provisions in its manual").

Even if the sexual-assault policy created a contract, however, Naca has failed to

show any breach. There is no dispute that, at their initial meeting, Hoppe informed

Naca that she was charged with harassment and gave her a copy of the harassment

policy (as well as a copy of the sexual-assault policy). App. 62 (196, 197-98); App. 153-

176 (Naca Dep. Ex. 29); App. 178. The harassment policy, like the sexual-assault policy,

gives the respondent the right to remain silent. App. 163 (harassment policy); App. 173

(sexual-assault policy). Because Naca already had the right to remain silent by virtue of

the harassment charge, Macalester did not breach any such right by failing to

immediately inform her of the sexual-assault charge.

Both policies also grant respondents the right to an advisor. App. 163 (harassment policy); App. 173 (sexual-assault policy). It is true that the policies differ slightly in that the sexual-assault policy grants respondents the right to "an advisor of their choice," whereas the harassment policy restricts those who can serve as an advisor to members the faculty, staff, or student body. Naca contends that this difference means that, under the sexual-assault policy (but not the harassment policy), she was entitled to an attorney. The sexual-assault policy is ambiguous on this point, however, and the evidence in the record suggests that Macalester historically has permitted only faculty, staff, and students to act as advisors under either policy. App. 376 (94-95); App. 400 (202-03); App. 465 (77-78).

Finally, even if Naca could show that a contract existed (which she can't), and that the contract was breached (which she also can't), she could not show that she was damaged by that breach. Naca hired an attorney in June 2015, after the MCHC issued its report but before Moe issued her case determination. App. 64 (204-05). Her attorney assisted her with her submissions to Moe, to the FPC, and to the appeals team, and Naca was given permission to bring her attorney to the FPC hearing (although, on his advice, she declined to do so). The only possible breach, then, is the fact that Naca did not have a lawyer to assist her during the MCHC's preliminary investigation.

There is no evidence that Naca was damaged by the fact that she was not assisted by a lawyer until after the MCHC referred her case to the provost. She was repeatedly allowed to supplement the record with the assistance of her lawyer, and she has never explained how having an attorney during the MCHC's inquiry would have changed anything. *Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578-79 (Minn. 2004) ("A breach of contract claim fails as a matter of law if the plaintiff cannot establish that he or she has been damaged by the alleged breach."); *Mandel v. Multiband Corp.*, No. A15-1133, 2016 WL 1175073, at *5 (Minn. Ct. App. Mar. 28, 2016) (affirming summary judgment on contract claim for failure to conduct a lengthier investigation before discharging employee because there was no evidence that the outcome would have been different).

Naca also claims that she had a contractual right not to be terminated arbitrarily or capriciously. But Naca does not cite any term of any contract providing such a right, nor does she cite any case supporting the proposition that Minnesota implies such a right in employment contracts.[25] *Cf. Mandel*, 2016 WL 1175073, at *7-8 (declining to read an implied covenant of good faith and fair dealing into a written employment agreement). Instead, she relies on various inapposite cases, including cases imposing a

---

[25]Aside from having no basis in Minnesota law, this claim differs from the sole contract claim that the Court gave Naca permission to pursue. *See* ECF No. 64 (denying Macalester's motion to dismiss Naca's breach-of-contract claim insofar as it is "based on the claim that Naca was deprived of certain contractual rights provided to a faculty member accused of sexual assault but not to a faculty member accused of sexual harassment").

duty on schools not to expel students arbitrarily, *see Abbariao v. Hamline University School of Law*, 258 N.W.2d 108, 113 (Minn. 1977), and cases arising under the Due Process Clause, *see Potemra v. Ping*, 462 F. Supp. 328, 331 (S.D. Ohio 1978).

These cases are irrelevant here, as Naca is bringing a breach-of-contract claim, not a due-process claim or the tort-type claim recognized in *Abbariao*. *Cf. Abbariao*, 258 N.W.2d at 113-14 (allowing claim based on duty not to act arbitrarily to proceed, but affirming dismissal of contract claim). Moreover, Naca has not cited any authority—and the Court has found none—applying the duty recognized in *Abbariao* to employers. Finally, even if Macalester had such a duty (it didn't)—and even if such a claim were properly before the Court (it isn't)—no reasonable jury could find that Macalester acted arbitrarily or capriciously in firing Naca.

For these reasons, Macalester's motion for summary judgment on Naca's breach-of-contract claim is granted.

### E. Motion to Supplement the Record

After briefing on Macalester's summary-judgment motion was complete—and more than a month after Naca's (extended) deadline for submitting her brief and supporting materials had passed, *see* D. Minn. LR 7.1(c)(2), ECF No. 184—Naca filed a motion to supplement the record with Macalester-related materials that she found on the Internet. ECF No. 238. Naca offers no plausible reason why she did not obtain and

submit these materials in a timely manner; all of the materials are addressed to issues that the parties have been contesting from the beginning of this case.[26]

Naca's attorney has a long history of violating the Local Rules of this District, in this case and in others. *See, e.g.*, ECF No. 108, ECF No. 110 at 4-5, ECF No. 159 at 1-2, ECF No. 182, ECF No. 230. His brief in support of Naca's motion to supplement appears to be a thinly veiled attempt to file an unauthorized surreply. *See* D. Minn. LR 7.1(i). Notably, Naca's brief in opposition to Macalester's motion for summary judgment is only one word short of this District's word limit. ECF No. 231-1, D. Minn. LR 7.1(f). As there is no reason why Naca could not have submitted these materials in a timely manner—and as this appears to be yet another attempt by Naca's counsel to circumvent the District's Local Rules—Naca's motion to supplement the record is denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Plaintiff's motion to supplement the record [ECF No. 238] is DENIED.

2.      Defendant's motion for summary judgment [ECF No. 175] is GRANTED.

---

[26]Naca contends that Macalester violated its discovery obligations by not producing these materials. The deadline for filing discovery-related motions has passed, however. Moreover, Naca does not explain why she could not have obtained these materials earlier, as they were apparently readily available on the Internet.

3.     Plaintiff's remaining claims are DISMISSED WITH PREJUDICE AND ON

THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  September 20, 2018                    s/Patrick J. Schiltz_____
                                             Patrick J. Schiltz
                                             United States District Judge